April 1998

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| A. DEAN OSWALT and REINIE OSWALT, husband and wife; CRAIG OSWALT and MICHELLE OSWALT, husband and wife; and KIRK OSWALT and STACIE OSWALT, husband and wife; | NO. 97-733 C |
| vs. | (Judge Futey) |
| United States of America. | |

AMENDED COMPLAINT

The plaintiffs, A. Dean Oswalt and Reinie Oswalt, husband and wife; Craig Oswalt and Michelle Oswalt, husband and wife; and Kirk Oswalt and Stacie Oswalt, husband and wife, allege as follows:

I.

This action was initially filed in the United States District Court, Eastern District of Washington as arising under the Federal Tort Claims Act, Sections 2681 through 2680 of Title 28 of the United States Code (28 USC §§ 2671 through 2680). That Court was vested with jurisdiction pursuant to Section 1346(b) of Title 28 of the United States Code (28 USC § 1346(b)).

II.

Upon motion by the defendant United States of America, the District Court initially dismissed the complaint on the basis that exclusive jurisdiction of this case was vested in the United





Velikanje Moore & Shore, P.S.
Attorneys at Law
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907

States Court of Federal Claims. A true and correct copy of this order is attached to the Defendant's Motion to Dismiss, or in the Alternative, for a More Definite Statement at Appendix 1-9, and is hereby incorporated by this reference. The Court later amended this ruling and ordered that this case be transferred to the United States Court of Federal Claims pursuant to 28 U.S.C. § 1631. A true and correct copy of that order granting plaintiffs' motion to amend to Defendant's Motion to Dismiss, or in the Alternative, for a More Definite Statement at Appendix 10-12 and is hereby incorporated by this reference.

III.

This Court is vested with jurisdiction pursuant to 28 U.S.C. §§ 1346 & 1491 and/or by virtue of the fact that the District Court's transfer order sets forth a "plausible" rationale for jurisdiction and is not clearly erroneous.

IV.

The plaintiffs A. Dean Oswalt and Reinie Oswalt were and are at all times relevant to this suit, husband and wife engaged in the business of farming lands located in Yakima County, Washington. Said plaintiffs also reside in Yakima County, Washington. The plaintiffs Craig Oswalt and Michelle Oswalt were and are at all times relevant to this suit, husband and wife engaged in the business of farming lands located in Yakima County, Washington. Said plaintiffs also reside in Yakima County, Washington. The plaintiffs Kirk Oswalt and Stacie Oswalt were and are at all times relevant to this suit, husband and wife engaged in the business of





Velikanje Moore & Shore, P.S.
attorneys at law
VMS
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907

farming lands located in Yakima County, Washington. Said plaintiffs also reside in Yakima County, Washington. All the acts or omissions herein complained of occurred within the Yakima Indian Reservation in Yakima County, Washington.

V.

The Yakima Indian Reservation was established by the Treaty of June 9, 1855 and was proclaimed by the President on April 18, 1859. In 1887, Congress passed the General Allotment Act, (24 Stat. 388), which would allow individual members of the Yakima Nation to select either 160 acres of grazing land or 80 acres of agricultural land in their individual capacities. Eligible members began their selections in 1892 and in 1897 the first allotments of 40 and 80 acre tracts of agricultural land were made. The Act of May 27, 1902 (32 Stat. 275) provided for the sale of the allotments, allowing the conveyance of "a full title to the purchaser, the same as if a final patent without restriction upon the alienation had been issued to the allottee."

VI.

On or about June 17, 1902 Congress passed the Reclamation Act, 43 U.S.C. §390 et seq. and shortly thereafter investigation was begun of the Yakima River Basin. The State of Washington passed the state Irrigation Act March 4, 1905 (R.C.W. 90.40) and on May 10, 1905, the United States, pursuant thereto, withdrew all of the then unappropriated waters of the Yakima River and its major tributaries. This action resulted in the creation of the Yakima Basin Reclamation Project. The Yakima Indian Reservation was to


Velikanje Moore & Shore, P.S.
Attorneys at Law
405 East Lincoln Ave.
P.O. Box 22550

become known as the Wapato Irrigation Project (hereinafter referred to as "WIP") portion of the Yakima Reclamation Project. The Wapato Irrigation Project is the largest irrigation district in the federal Yakima Reclamation Project with lands exceeding 136,000 acres. Approximately 55% of the land is Indian trust land and 45% is individually owned.

VII.

In December 1904 Congress passed additional legislation applicable to the Yakima Indian Reservation under the act of 33 Stat. 595. This statute provided, in pertinent part:

> That the Secretary of the Interior is hereby authorized, in the cases of entrymen and purchasers of lands now irrigated or that may hereafter be irrigated from systems constructed for the benefit of the Indians, to require such annual proportionate payments to be made as may be just and equitable for the maintenance of said systems; provided, that in appraising the value of irrigable lands, such sum per acre as the Secretary of the Interior may deem proper, to be determined as nearly as may be by the total cost of the irrigation system or systems, shall be added as the proportionate share of the cost of placing water on said lands, and when the entrymen or purchaser shall have paid in full the appraised value of the land, including the costs of providing water therefore, the Secretary of the Interior shall give to him such evidence of title in writing to a perpetual water right as may be deemed suitable. . . .

VIII.

In order to fulfill this statutory requirement, by 1909 a Petition for Water Right within the Wapato Unit was required to be executed by all applicants for patents in fee before any water could be delivered to the land. Now designated as "Application for Water Right," it indicates that the owner of the land "desires to acquire a permanent right to water for irrigation



A4

Velikanje Moore & Shore, P.S.
attorneys at law
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907

purposes". It requires the owner to pay their "proportionate" share of the irrigation charges applicable to their land and such charges are a "first lien" against the land. The U.S., acting through the Project Engineer, also reserves the right to refuse delivery of any water to the land upon the failure of the landown to promptly pay the irrigation charges. It further provides th when the irrigation charges have been paid, the U.S. will th cause to be issued to the owners of the land a water rig certificate to the "fact that such land has a perpetual water rig attached thereto.

IX.

Before approving the Yakima Reclamation Project in 1906, the Acting Secretary of the Interior had arbitrarily limited the diversion of water from the Yakima River to 147 cubic feet per second. This amount of water was not sufficient to satisfy the present or future irrigation needs and based on this fact, Congress passed the Act of August 1, 1914 which provided "at least seven hundred and twenty cubic feet per second of water . . . for the irrigation of forty acres on each Indian allotment."

X.

On July 16, 1914, the Secretary approved the last schedule of 1,800 eighty acre allotments. Pursuant to the Act of 1914, the Interior Department designated 40 acres of each of the 1800 allotments that were to receive the 720 c.f.s from the Yakima River. This constituted 72,000 acres which were then established as the "A" lands. Another 48,000 acres were designated as the "B"


Velikanje Moore & Shore, P.S.
attorneys at law
VMS
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907

lands. This designation then accounted for the entire 120,000 acres of land that had previously been identified as potentially irrigable acres.

XI.

The Warren Act of 1911, passed by Congress, authorized the United States to contract for the storage and carriage of water from the construction and use of reservoirs and diversion facilities in reclamation projects. Pursuant to the Act, the Bureau of Reclamation (hereinafter referred to as the "BOR") and the now Bureau of Indian Affairs (hereinafter referred to as the "BIA") entered into a contract on March 9, 1921, to divert 250,000 acre feet of storage water from the Yakima River to the Wapato Irrigation Project. This water was to supply irrigation to the "B" lands referenced in the preceding paragraph of this complaint. On September 3, 1936, the BOR and the BIA entered into a contract for an additional 100,000 acre feet of storage water to be diverted from the Yakima River. This water was to be applied to the "A" lands referenced in the preceding paragraph of this complaint.

Pro-ratable

XII.

The WIP is only one of numerous irrigation districts within the Yakima Reclamation Project. Each of these districts will have an entitlement to water that will either be on a "proratable" or "non-proratable" basis. All "non-proratable" water requirements must be met before any of the "proratable" needs will be fulfilled. Since the inception of the Yakima Reclamation Project, the "non-proratable" water requirements have been provided, in full, in



A6

Velikanje Moore & Shore, P.S.
attorneys at law
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907

every year. However, during water short years, the "proratable" water requirement has had to be cut back from full allocations. Thus, the "proratable" water is only provided in a certain percentage of what the full right would be if sufficient water was available to supply the full right.

XIII.

The 720 cubic feet per second of water appurtenant to the "A" lands as set forth in paragraph X above are "non-proratable" waters. The two contracts for the 250,000 acre feet and 100,000 acre feet of water as set forth in paragraph XI above are "proratable" waters.

XIV.

In addition to the Acts of Congress and contracts as set forth above, the duties and obligation for the delivery and entitlement to irrigation water for entities located in the Yakima Reclamation Project were the subject of a consent decree entered in 1945 in *Kittitas Reclamation Dist. V. Sunnyside Vly. Irrig. Dist.* (E.D. Wash. 1939)(Civil Action No. 21) . Those duties and obligations for the delivery and entitlement to irrigation water for entities located in the Yakima Reclamation Project are also the subject of a pending general water adjudication action in Washington, *Ecology v. Aquavella*, Yakima County Cause No. 77-2-01484-5. A "Conditional Final Order" adjudicating the water rights of the Yakima Indian Nation was entered by the court on September 12, 1996. A true and correct copy of this order is attached to the affidavit of J. Jay Carroll on file herein and is hereby incorporated by this reference.



Velikanje Moore & Shore, P.S.
attorneys at law
VMS
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907
(509) 248-6030

XV.

In 1994, the plaintiffs leased or owned certain lands located within the Wapato Irrigation Project within the Yakima Indian Reservation in Yakima County, Washington for the purpose of raising commercial crops. In order to grow the crops that were to be planted, the plaintiffs required the use of supplemental irrigation water that was to be provided from the Yakima River through the diversions and canals of the Wapato Irrigation Project.

XVI.

The right to obtain irrigation water for all fee lands owned or leased by the plaintiffs are derived from the "Application for Water Right Wapato Unit Yakima Reservation, Washington". The applicable applications concerning lands owned or leased by the plaintiffs are attached to the Declaration of Benjamin A. Domondon as "Attachment 2" (Exhibit 5 to the United States' Statement of Material Facts on file herein) and are hereby incorporated by this reference.

XVII.

The right to obtain irrigation water for all trust lands leased by the plaintiffs are derived from the various leases entered into by the plaintiffs. These leases are attached to the Declaration of Benjamin A. Domondon as "Attachment 3" (Exhibit 5 to the United States' Statement of Material Facts on file herein) and are hereby incorporated by this reference.



Velikanje Moore & Shore, P.S.
attorneys at law
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907

XVIII.

With respect to the plaintiffs in this case, the lands that they either owned or leased in 1994 can be broken down into "A" and "B" lands as follows:

A. Dean Oswalt

| Allotment # | Serial # | Acres of "A" Lands | Acres of "B" Lands |
|---|---|---|---|
| C 794 | 1591C | 40 | 35 |
| C 299 | 1675 | 15.63 | 20 |
| C 300 | 1652 | 39.59 | 20 |
| C 596 | 3174 | 52.4 | 46.1 |
| L 361 | 0361 | 39.48 | 12.79 |
| L 363 | 0363 | 6.9 | 0.00 |
| L 1988 | 2081 | 40 | 25.38 |
| L 850 | 2121 | 40 | 40 |
| L T2661 | 2108 | 30 | 0.00 |
| L T290 | 2756 | 0.00 | 13 |
| L 849 | 2027 | 40 | 0.00 |
| L T2482 | 1649 | 37.6 | 33.4 |
| L T1131½ | 2440B | 38.75 | 0.00 |
| L 263 | 2452 | 40 | 40 |
| L 289 | 3259 | 39.5 | 14.39 |
| TOTALS | | 499.85 | 300.06 |

///

///

///

///

///





Velikanje Moore & Shore, P.S.
attorneys at law
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907

**Craig Oswalt**

| Allotment # | Serial # | Acres of "A" Lands | Acres of "B" Lands |
|---|---|---|---|
| 766 | 0766 | 40 | 32.5 |
| T2303 & 2303 | 2688 not paid | 40 | 24.6 |
| 3704 & 3705 | 3704 & 3705 not paid | 65 | 0.00 |
| T1011 | 2704 not paid | 39.5 | 40 |
| 848 | 1784 | 40 | 39.5 |
| TOTAL | | 224.5 | 136.6 |

**Kirk Oswalt**

| Allotment # | Serial # | Acres of "A" Lands | Acres of "B" Lands |
|---|---|---|---|
| 849 | 2027 | 0 | 38.2 |
| 1752 | 2585 | 40 | 40 |
| TOTAL | | 40 | 78.2 |

XIX.

The plaintiffs paid and or made satisfactory arrangements to pay all assessments required for the delivery or irrigation water from the WIP to the leased or owned lands in questions. As of this date, all assessments for the 1994 irrigation season have been paid by the plaintiffs. By virtue of having paid and or made satisfactory arrangements for payment of irrigation assessments, the plaintiffs were entitled to the delivery of their proportionate share of irrigation water provided by the WIP.

XX.

Beginning in March of 1994, the plaintiffs planted the leased lands to crops which would require the supplemental irrigation water provided by the WIP in order to properly grow and produce a



Velikanje Moore & Shore, P.S.
attorneys at law
VMS
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907
(509) 248-6030

commercial crop. Additionally, some of the land was already planted to mint which would also need the supplemental irrigation water provided by the WIP in order to properly grow and produce a commercial crop. Irrigation water from the WIP was beneficially applied to all leased lands beginning in April 1994 and continuing on through June 9, 1994.

XXI.

During the approximate time frame of June 10, 1994, through July 25, the plaintiffs received little or no irrigation water from the WIP. During this time frame the plaintiffs repeatedly requested the delivery of irrigation water. As a direct and proximate result of this lack of water, the plaintiffs suffered a loss of production in the crops that they grew.

XXII.

At all times herein mentioned, defendant, by and through the Department of Interior, Bureau of Indian Affairs, Wapato Irrigation Project, a federal agency of defendant, operates, controls and manages the diversion and distribution facilities which serve the lands within the Wapato Irrigation Project.

XXIII.

Plaintiffs made repeated requests to WIP personnel for the delivery of irrigation water during the approximate time frame of June 10, 1994 through July 25, 1994. Despite said requests, plaintiffs were provided with little or no water to apply to their crops during that time frame. At the same time, other farmers on the same canals were receiving irrigation water sufficient to water


Velikanje Moore & Shore, P.S.
attorneys at law
VMS
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907
(509) 248-6030

their crops. By virtue of having paid and or made satisfactory arrangements to pay the assessments, the plaintiffs had the same right to irrigation water as any other person or entity in the WIP who paid his or her assessment. Plaintiffs did not receive their proportionate share of irrigation water from the WIP in 1994.

XXIV.

As a direct and proximate result of the defendant's breach of contract for failing to deliver their proportionate share of irrigation water upon the payment or promise to pay applicable assessments, plaintiffs suffered a loss of production in the commercial crops grown on their lands serviced by the WIP in 1994 in addition to incurring expenses in an attempt to obtain some water for irrigation purposes during the time in question in the following amounts:

Plaintiffs A. Dean and Reinie Oswalt: $205,754.77;

Plaintiffs Craig and Michelle Oswalt: $76,745.18; and

Kirk and Stacie Oswalt: $38,146.68.

XXV.

The plaintiffs are entitled, pursuant to 28 U.S.C. § 2412, to an award of fees and other expenses in that the position of the United States is not substantially justified.

WHEREFORE, plaintiffs request judgment against Defendant as follows:

(1) As to plaintiffs A. Dean Oswalt and Reinie Oswalt, $205,754.77;





Velikanje Moore & Shore, P.S.
attorneys at law
VMS
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907
(509) 248-6030

(2) As to plaintiffs Craig Oswalt and Michelle Oswalt, $76,745.18;

(3) As to plaintiffs Kirk Oswalt and Stacie Oswalt, $38,146.68;

(4) As to all plaintiffs, their fees and other expenses incurred in this matter;

(5) Such other and further relief as the court may deem just and equitable.

DATED this 17TH day of April, 1998.

VELIKANJE, MOORE & SHORE, P.S.
Attorneys for Plaintiffs

By: [signature]
J. Jay Carroll
WSBA NO. 17424

CERTIFICATE OF TRANSMITTAL

I hereby certify that we sent a copy of this to the attorneys for the ~~plaintiffs~~/defendants by mail, postage prepaid, ~~or by attorneys messenger service~~. I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Yakima, WA 4/17/98
Date

[signature] Lori A Busby





Velikanje Moore & Shore, P.S.
attorneys at law
VMS
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907
(509) 248-6030

2

# In the United States Court of Federal Claims

No. 97-733C

(Filed October 17, 2000)

* * * * * * * * * * * * * * * * * * * * * * *

A. DEAN OSWALT and REINIE OSWALT, husband and wife, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

* * * * * * * * * * * * * * * * * * * * * * *

*John Jay Carroll*, Yakima, Washington, attorney of record for plaintiff.

*Kathleen Zahorik Quill*, Department of Justice, Washington, D.C., with whom was *Acting Assistant Attorney General David W. Ogden*, for defendant. *David M. Cohen*, Director, *James M. Kinsella*, Deputy Director.

## OPINION

*Futey*, Judge.

This breach of contract case is before the court on defendant's motion to dismiss or, in the alternative, motion for summary judgment, and plaintiffs' cross-motion for summary judgment. Defendant maintains this court lacks jurisdiction over plaintiffs' claims concerning their alleged right to receive water on several properties located in the Wapato Irrigation Project (WIP) in Yakima County, Washington. In the alternative, defendant contends plaintiffs failed to exhaust administrative remedies before bringing this action. Plaintiffs maintain they are owners or lessees of the properties at issue and that they made sufficient arrangements to pay their operation and maintenance assessments to receive irrigation water. Plaintiffs assert defendant's failure to provide them with their portion of water breached their lease agreements and infringed their water rights obtained through ownership of the lands.

RECEIVED OCT 18 2000

## Factual Background

Plaintiffs A. Dean and Reinie Oswalt, Craig and Michelle Oswalt, and Kirk and Stacie Oswalt (Plaintiffs) farm lands located within WIP. WIP is located in the Yakima Indian Reservation (Reservation), and is administered by the Bureau of Indian Affairs (BIA) on behalf of the Secretary of the Department of the Interior (Secretary).[1] The Reservation, created by treaty on June 9, 1855, is located in Yakima County, Washington.

In 1887, Congress passed the General Allotment Act (GAA), which directed the Secretary to allot lands within the Reservation to individual Indians. 24 Stat. 388 (1887). The GAA also authorized the Secretary to hold the allotted land in trust for a period of twenty-five years. 24 Stat. 389 (1887). The GAA further authorized the Secretary to promulgate rules and regulations in order "to secure a just and equal distribution" of irrigation water to the extent the water was necessary to render the land "available for . . . agricultural purposes." 24 Stat. 390 (1887).

The Reclamation Act of 1902 (RA) permitted the Secretary to construct irrigation projects to provide water for agricultural purposes. 43 U.S.C. § 317 (*repealed*). WIP was created pursuant to the RA. That same year Congress enacted legislation that permitted American Indians or their heirs to sell and convey land obtained via the GAA. 32 Stat. 275 (1902). In 1904, Congress directed the Secretary "to sell or dispose of unallotted lands embraced in the Yakima Indian Reservation." 33 Stat. 596 (1904). This legislation required the Secretary to apply the proceeds of the sale of unallotted land to, among other things, "the construction, completion, and maintenance of irrigation ditches." 33 Stat. 597 (1904). This legislation further permitted the Secretary "to require . . . annual proportionate payments to be made as may be just and equitable for the maintenance of [irrigation] systems." 33 Stat. 358 (1904).

In 1916, Congress enacted legislation authorizing the construction of a dam across the Yakima River for "the diversion and utilization of water provided for forty acres of each Indian allotment on the Yakima Reservation." 39 Stat. 154 (1916). In addition, this legislation permitted the Secretary to fix operation and maintenance charges, as well as implement rules and regulations concerning the distribution of water. *Id.* The Secretary promulgated regulations governing the irrigation of Indian lands that are directed at the operation and maintenance of the water delivery system. 25 C.F.R. Part 171 (1994). Under this regulatory scheme,

---

[1] WIP is one of numerous irrigation districts located within the Yakima Reclamation Project.

defendant, acting through BIA, sets rates paid for water, assesses and collects fees for maintenance, and delivers irrigation water to the boundary of individual farm units. 25 C.F.R. § 171 (1994). BIA also operates, controls, and manages the diversion and distribution facilities that serve the lands within WIP.[2] Once water is diverted into the Yakima Indian Reservation at WIP diversion points, WIP allocates this water among landowners or users through a system of irrigation canals.[3]

There are two categories of land serviced by irrigation water -- fee lands and trust lands. Fee lands are lands conveyed by the Department of the Interior to private individuals, who in the present case allegedly sold or leased these lands to plaintiffs. Trust lands, however, are held by the Secretary in trust for the Yakima Nation, and they are leased by Indians. Plaintiffs assert they leased numerous trust lands in WIP.

The right to obtain irrigation water for fee lands is governed by a document entitled "Application for Water Right." The Application for Water Right incorporates 39 Stat. 154 (1916), and states "[t]he cost of the entire diversion works and distribution and drainage system shall be reimbursed to the United States by the owners of the lands irrigable thereunder in not to exceed twenty annual installments."[4] Reimbursement is made through an operation and maintenance assessment, in which the funds are used for "[a]nnual operation and maintenance of the Wapato Unit of the Yakima Irrigation Project," and are payable "under such rules and regulations as the Secretary . . . may from time to time prescribe."[5] With respect to trust lands, the right to obtain irrigation water is governed by Lease Agreements that Indians entered into with the Secretary.

The parties' dispute concerns a number of events that occurred in 1994. First, plaintiffs failed to fully pay their operation and maintenance assessments prior to the 1994 irrigation season. The record provides that plaintiffs made partial payments on April 29, 1994, and June 23, 1994. Second, the Reservation experienced one of the worst droughts on record, resulting in drastic reduction in the amount of water available for irrigation. In fact, on May 18, 1994, the United States Bureau of Reclamation (BOR) notified all Yakima district managers,

---

2 Complaint ¶ 12.

3 *Id.*

4 Defendant's Motion To Dismiss Or, In The Alternative, For Summary Judgment (Def.'s Mot.), Appendix (App.) at 13, ¶ 2.

5 *Id.* at 14, ¶¶ 7-8.

including the manager of WIP, that each district would receive 35% of proratable storage water that it was entitled to for the 1994 season. On June 8, 1994, BOR notified district managers that water supply conditions deteriorated, and consequently, only 34% of the proratable water entitlements would be available to each district.[6] In order to cope with the drought conditions, WIP adopted a diversion plan, as well as a water distribution plan, for the 1994 season. The purpose of the water distribution plan was to "ensure an equitable distribution of the available water to each major lateral and subdivision of the project."[7]

Plaintiffs admit they received their proportionate share of water until June 9, 1994. According to plaintiffs, from June 10, 1994, until July 24, 1994, there was insufficient water in the canals servicing the land they farmed to permit irrigation. Plaintiffs maintain that other farmers, whose lands are located further up the canal, received sufficient irrigation water.[8] Plaintiffs contend that in June 1994 they met with A. C. Oberly, WIP's Administrator, and complained that the lands they farmed were not receiving adequate irrigation water for their crops.[9] In addition, plaintiffs posit that at this meeting they "agreed to sign a promissory note for the balance of the money due on the [operation and maintenance] assessments for the 1994 season," and that "Mr. Oberly agreed to draw up the note for signature by the plaintiffs."[10]

Plaintiffs filed an Amended Complaint on April 21, 1998, asserting defendant breached the terms of both the Application for Water Right and leases by failing to provide them with their proportionate share of irrigation water. According to plaintiffs, these breaches resulted in the loss of production in the commercial crops grown on the land they farmed. Plaintiffs also maintain they were forced to incur additional expenses in an attempt to obtain water for irrigation. Plaintiffs claim this breach caused them to suffer a substantial loss of their crops. On September 10, 1998, defendant filed its Motion To Dismiss, Or In The Alternative, For Summary Judgment, asserting: (1) the court lacked jurisdiction to adjudicate plaintiffs' claims because plaintiffs lack privity of contract with the government; and (2) if the court finds it has jurisdiction, plaintiffs failed

---

[6] *See* Oberly Affidavit (Aff.), ¶¶ 3 & 6, Def.'s Mot., App. at 177.

[7] *Id.*

[8] A. Dean Oswalt Aff.¶ 7; Def.'s Mot., App. at 301.

[9] Craig Oswalt Aff., Plaintiffs' Reply Memorandum In Support Of Motion For Summary Judgment (Pls.' Reply Mem.), Exhibit (Ex.) C, at 1.

[10] Pls.' Reply Mem. at 3.

to exhaust their administrative remedies before filing suit in this court. On June 4, 1999, the court held a telephonic conference with the parties concerning the merits of the case. In an order issued that same say, the court ordered plaintiffs to file additional evidence relating to the issue of privity of contract. Oral argument was held on November 30, 1999, and on December 2, 1999, the court ordered the parties to: (1) conduct further jurisdictional discovery and provide the court with additional information concerning privity of contract; and (2) submit supplemental briefs addressing the derivative rights issue raised during oral argument and whether the right to receive irrigation water runs with the land under Washington state law. The parties filed documents in response to the court's December 2, 1999 order on February 1, 2000.

<u>Discussion</u>

I. Motion to Dismiss

Defendant has filed a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1). In ruling on such a motion, the court must accept as true the complaint's undisputed factual allegations and construe them in a light most favorable to the plaintiff. ***Scheuer v. Rhodes***, 416 U.S. 232, 236 (1974); ***Hamlet v. United States***, 873 F.2d 1414, 1415 (Fed. Cir. 1989); ***Farmers Grain Co. v. United States***, 29 Fed. Cl. 684, 686 (1993). "When the defendant questions this Court's subject matter jurisdiction with a motion pursuant to RCFC 12(b)(1), the burden is on the plaintiff to establish jurisdiction by a preponderance of the evidence." ***First Hartford Corp. Pension Plan & Trust v. United States***, 42 Fed. Cl. 599, 603 (1998) (citing ***Reynolds v. Army and Air Force Exch. Serv.***, 846 F.2d 746, 748 (Fed. Cir. 1988)). Moreover, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." ***Kentucky Bridge & Dam, Inc. v. United States***, 42 Fed. Cl. 501, 516 (1998). If the undisputed facts reveal any possible basis on which the non-moving party may prevail, the court must deny the motion. ***Scheuer***, 416 U.S. at 236; ***W.R. Cooper Gen. Contractor, Inc. v. United States***, 843 F.2d 1362, 1364 (Fed. Cir. 1988). If the motion challenges the truth of the jurisdictional facts alleged in the complaint, however, the court may consider relevant evidence in order to resolve the factual dispute. ***Rocovich v. United States***, 933 F.2d 991, 994 (Fed. Cir. 1991). "The court should 'look beyond the pleadings and decide for itself those facts, even if in dispute, which are necessary for a determination of [the] jurisdictional merits.'" ***Farmers Grain***, 29 Fed. Cl. at 686 (citing ***Raymark***, 15 Cl. Ct. at 335).

This court's authority to grant relief is dependent upon the extent to which the United States has waived its sovereign immunity and consented to be sued.

*United States v. Testan*, 424 U.S. 392, 399 (1976). "The government consents to be sued only by those with whom it has privity of contract . . . ." *Erikson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984). Indeed, privity of contract is "an indispensable prerequisite to the maintenance of a suit in this court against the government under the Tucker Act." *Thomas Funding Corp. v. United States*, 15 Cl. Ct. 495, 499 (1988); *see also National Leasehold Housing Assoc. v. United States*, 105 F.3d 1423, 1435 (Fed. Cir. 1997) ("privity of contract . . . [is] an undisputed prerequisite for standing to sue in the Court of Federal Claims under the Tucker Act"). Therefore, absent a showing of either privity of contract, or a demonstration of an exception to the privity requirement, such as third-party beneficiary status, no jurisdiction exists to pursue a contract claim in this court. *Maniere v. United States*, 31 Fed. Cl. 410, 415 (1994).

Defendant maintains this court lacks jurisdiction to entertain plaintiffs' requested relief with regard to all fee lands and trust lands. With respect to fee lands, defendant asserts plaintiffs are not in privity of contract with the United States because they were not signatories to the Application for Water Right documents.[11] For the trust lands in which plaintiffs did not enter leases with defendant,[12] defendant contends this court lacks jurisdiction because plaintiffs: (1) were not signatories to the leases; (2) did not obtain the Secretary's permission to sublease those lands; and (3) have not put forth evidence demonstrating they are assignees to the leases. For the seven trust lands in which plaintiffs did sign leases with defendant, defendant argues it is not contractually bound by those leases

---

[11] The fee lands at issue are allotments 299, 300, 596, 766 and 794.

[12] Plaintiffs did not enter leases with defendant for the following Trust Lands:

| Lease # | Allotment # | Lessee |
|---|---|---|
| 1-7078 | 848, 849 | Charles Lewis |
| 1-7098 | 850 | Charles Lewis |
| 1-7099 | 289 | Charles Lewis |
| 1-7190 | T-290 | Charles Lewis |
| 1-8514 | 1752 | Charles Lewis |
| 1-8554 | T-1131.5B | Charles Lewis |
| 1-8511 | T-2661A | Charles Lewis |
| 1-6310 | T-2482, 2482 | Charles Lewis |
| 1-7587 | 1013A | Charles Lewis |
| 1-8087 | 263, T-263 | SKD Farms |

because it was acting on behalf of the Indians.[13]

Defendant's assertion that plaintiffs must be signatories to establish privity of contract is an improper characterization of the law. There is no requirement that plaintiffs must be signatories to a contract to establish privity. ***Bluebonnet Savings Bank, FSB v. United States***, 43 Fed. Cl. 69, 74 (1999). Rather, plaintiffs need only be a party to the contract. ***Id.***; ***Castle v. United States***, 42 Fed. Cl. 859, 865 (1999) (finding privity despite the fact that plaintiffs were not signatories to an agreement in which they were named). Plaintiffs, therefore, must establish they are parties to a contract with defendant or that defendant has a contractual obligation.

With respect to the fee lands, the determination of whether plaintiffs are parties to a contract with defendant requires an examination of the language of the Application for Water Right documents. This issue presents the court with a question of contract interpretation, upon which the court may rule as a matter of law. ***National Rural Utils. Co-op Fin. Corp. v. United States***, 14 Cl. Ct. 130 (1988), *aff'd*, 867 F.2d 1393 (Fed. Cir. 1989). Contract interpretation ordinarily begins with "the plain meaning of the provision in question." ***S.W. Aircraft Inc. v. United States***, 213 Ct. Cl. 206, 212 (1977), which the court must construe by its plain and unambiguous language. ***National Rural***, 14 Cl. Ct. at 136. "[T]he language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." ***Hol-Gar Mfg. Corp. v. United States***, 169 Ct. Cl. 384, 388 (1965). A court must give reasonable meaning to all parts of the contract "so as to harmonize and give meaning to all its provisions," and not render portions of the contract meaningless. ***Thanet Corp. v. United States***, 219 Ct. Cl. 75, 82 (1979); ***see also Fortec Constructors v. United States***, 760 F.2d 1288, 1292 (Fed. Cir.

---

13 Plaintiffs entered leases with defendant for the following Trust Lands:

| Lease # | Allotment # | Lessee |
|---|---|---|
| 1-7614 | 1988 | Dean Oswalt |
| 1-7022 | 363 | Dean Oswalt |
| 1-7023 | 3694 | Dean Oswalt |
| 1-7287 | T-1011 | Kirk Oswalt |
| 1-8705 | 3704 & 3705 | Craig Oswalt |
| 1-8120 | 2303 & T-2303 | Craig Oswalt |
| 1-7859 | 361 | Dean Oswalt |

1985). Furthermore, "an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona v. United States*, 216 Ct. Cl. 221, 235-36 (1978).

The Application for Water Right documents were entered by the Secretary and the original owner of the particular parcel of fee land. These documents provide evidence of the parties' intentions at the time of contracting. An examination of these documents reveal that plaintiffs are neither signatories to the contracts nor owners of the fee lands.

With respect to irrigation water, the documents provide:

> 9. It is understood and agreed by and between the parties hereto that when all irrigation charges against the lands described herein have been paid, the party of the first part will issue, or cause to be issued . . . a water-right certificate, or other suitable evidence of the fact that such land has a *perpetual water right attached thereto*.[14]

It is clear, therefore, that the right to irrigation water runs with the land. Regarding the payment of operation and maintenance assessments, the Application for Water Right documents bind the original owner, "his heirs and assigns to pay all charges for water specified herein, whenever the same shall become due and payable, under such rules and regulations as the Secretary of the Interior may from time to time prescribe."[15] Construing these provisions together, it is clear that the parties did not intend the right to irrigation water, as well as the obligation to pay operation and maintenance assessments, be limited solely to signatories. Conversely, defendant obliged itself to deliver irrigation water perpetually to the owner, his heirs or assigns, in exchange for payment of operation and maintenance assessments. Defendant, therefore, expressed an intent to be contractually bound with that class of individuals. Accordingly, in order to establish privity of contract, plaintiffs need only prove they are owners, heirs or assigns of the property. *See Coggeshell Dev. Corp. v. United States*, 23 Cl. Ct. 739, 742 (1991) (finding privity of contract between the United States and successors-in-title where rights and obligations expressed in a deed applied to the original parties and their successors).

---

14 Def.'s Mot., App. at 11, ¶ 9 (emphasis added).

15 *Id.* at 21.

Plaintiffs have provided the court with a statutory warranty deed from Maude Peterson to plaintiff A. Dean Oswalt proving he owns Lot 794 of the fee lands.[16] Plaintiffs have not, however, demonstrated that they are owners of the other four fee lands or that they are heirs to the original owner, or assignees of the Application for Water Right. In an attempt to establish contractual privity for these lands, plaintiffs direct the court to the declaration of Benjamin Domondon,[17] an accountant for WIP, and with a WIP spreadsheet that lists plaintiffs as lessees. Plaintiffs also submitted copies of their FTCA claims before BIA, BIA's denial of their claims, and subleases they entered with Charles Lewis. The fact that plaintiffs filed a FTCA claim arising out of their use of these properties does not establish privity of contract. In addition, it is unclear whether plaintiffs entered subleases with the owners of the fee lands in dispute. Plaintiffs have not provided any additional evidence on these fee lands despite the court's order dated December 2, 1999, requesting such information.[18] Since plaintiffs have provided evidence proving ownership of only one of the fee lands, this court lacks jurisdiction to hear plaintiffs' claims in regards to the other four fee lands.

---

[16] Plaintiffs' Supplemental Memorandum Regarding Water Rights Issues (Pls.' Supp.), App., Ex. D.

[17] *See* Def.'s Mot. App. at 5-8. Mr. Domondon testified to the Oswalts' late payments and the preparation of a promissory note.

[18] Besides submitting the statutory warranty deed from Peterson to Oswalt, plaintiffs included six other documents with their supplemental memorandum filed in response to the court's December 2, 1999 order. Three of the remaining documents are letters to the Secretary from the Commissioner of Indian Affairs discussing perpetual water rights for the lands included in the Yakima Irrigation Project. (Pls.' Supp., App. Exhibits A-C.) These letters are irrelevant for establishing contractual privity because they only suggest that, if there is privity, plaintiff can take advantage of the water rights attached to the land. Exhibit E is a quit claim deed from Mike Zecchino to Leonard M. Zecchino, and Exhibit F is a statutory warranty deed from Robert L. Lane and Gerry M. Lane to Martin K. Childers and Patricia A. Childers. These two deeds are irrelevant because they do not specify whether plaintiffs have any interest in these lands either as owners, lessees, or sub-lessees. Finally, Exhibit G contains maps of the Yakima Indian Reservation. These maps are not helpful to the issue of contractual privity because they simply set forth various allotments and do not show which lands plaintiffs own or lease. Moreover, it is not clear when these maps were made and to which fee and trust lands they display.

With respect to the trust lands, the administrative record provides plaintiffs entered seven separate leases with defendant. Plaintiffs, therefore, are in privity of contract with defendant for these seven trust lands and the court has jurisdiction to hear plaintiffs' breach of contract claim as it relates to these properties. These lands include lots 1988, 363, 3694, T-1011, 3704 and 3705, 2303 and T-2303, and 361.[19]

Defendant argues that ***United States v. Algoma***, 305 U.S. 415 (1939) provides controlling precedent in this case. ***Algoma*** held that when a government official enters a contract on behalf of another, the contract does not create any direct obligation on the government. ***Id.*** at 421. Defendant contends the Secretary entered the lease agreements for the seven trust lands on behalf of Indians, and thus it has no obligation to plaintiffs in this case.

The ***Algoma*** case involved the sale of timber from allotted lands (lands owned by individuals) and unallotted lands (lands held in trust by the Secretary for the benefit of Indians) located within the Klamath Indian Reservation. ***Id.*** at 417. Pursuant to statute, owners of allotted land were permitted, with consent of the Secretary, to sell timber located on their property. ***Id.*** Similarly, the Secretary was permitted to sell timber located on unallotted lands, but was required to use the proceeds for the benefit of the Indians. ***Id.*** Timber upon these lands was offered for sale. ***Id.*** at 419. The Secretary accepted Algoma's bid and both Algoma and the Secretary executed a contract of sale. ***Id.*** In addition, Algoma entered into separate contracts with twenty-one individuals for the sale of timber, which the Secretary approved.

After purchasing the timber, Algoma filed suit against defendant in the United States Court of Claims, alleging it had overpaid defendant and seeking a refund. ***Id.*** at 418. The Court of Claims found the United States was a party to the contracts with the twenty-one individuals and that Algoma had overpaid, and thus awarded Algoma compensation. ***Id.*** The Supreme Court reversed, finding that no contract existed between the United States and Algoma. ***Id.*** at 421. First, the court examined the language of the contracts and determined that neither the Secretary nor any of its officers were named parties. ***Id.*** Significantly, the court recognized that the Secretary and other Department officials merely acted on behalf of the Klamath Indians by supervising the execution of the contracts, which was consistent with their role as protector of the Indians. ***Id.*** The Court held that in performing this role, the Secretary neither expressly nor impliedly assumed any

---

[19] There are seven leases addressed here, but some of these leases include more than one allotment. This is why there are nine lot numbers listed even though the court refers to these lands as "seven trust lands."

obligation to Algoma. *Id.*

The ***Algoma*** case is factually distinguishable from the present case because, unlike ***Algoma,*** defendant, who operates WIP, undertook an obligation to deliver water to the lands at issue. Although the leases do not use the term "perpetual right to water," the court can ascertain the parties' intent from the four corners of those documents. First, all the lease agreements suggest the lessee would use the property for the purpose of growing crops by utilizing irrigation water. The leases require the lessee to pay annual operation and maintenance assessments which are used by BIA for upkeep of the irrigation system.[20] Additionally, the leases require the lessee to "make beneficial use of water delivered through the irrigation project."[21] When reading these provisions together, it is clear the Secretary undertook an obligation to deliver irrigation water in exchange for payment of operation and maintenance assessments. Defendant's argument based on ***Algoma*** is unpersuasive.

For the remaining ten trust lands, an examination of the administrative record reveals plaintiffs are not lessees to these properties with defendant. Rather, plaintiffs are sublessees because they are leasing the lands from third persons, who in turn are leasing the land from defendant. Each Lease Agreement explicitly restricts the lessee's right to sublease his leasehold:

> 6. SUBLEASES AND ASSIGNMENTS -- Unless otherwise provided herein, a sublease, assignment or amendment of this lease may be made only with the approval of the Secretary and the written consent of all parties to this lease, including the surety or sureties.[22]

Plaintiffs have not demonstrated they received permission from the Secretary to sublease the properties in issue.

Similarly, there is no evidence to suggest plaintiffs were assignees to the Lease Agreements. Additionally, the fact that Martin Childers, Leonard Zecchino and AP Farms received bills for operation and maintenance assessments for certain

---

[20] Def.'s Mot., App. at 45, ¶ 3.

[21] *Id.* at 47, ¶ 9(c).

[22] Def.'s Mot., App. at 32, ¶ 6. *See also* 25 U.S.C. § 415(a) (1994) (stating that "restricted Indian lands . . . may be leased by the Indian owners, with the approval of the Secretary of the Interior . . . ."); 25 C.F.R. § 162.5(a).

properties that plaintiffs farmed suggests plaintiffs were not assignees to the leases of those lands. Moreover, if plaintiffs are assignees to the leases, they would have to comply with the Assignment of Contracts Act, or demonstrate that defendant's conduct constituted a waiver of those rights. Plaintiffs have not provided any information proving compliance or a waiver by defendant. Based upon the facts presented, plaintiffs have failed to meet their burden of establishing that they are in privity of contract with defendant for the remaining ten trust lands.

## II. Motion for Summary Judgment[23]

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 247 (1986); ***Jay v. Secretary, DHHS***, 998 F.2d 979 (Fed. Cir. 1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. ***Anderson***, 477 U.S. at 248. The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. ***Prineville Sawmill Co. v. United States***, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing ***Mingus Constructors, Inc. v. United States***, 812 F.2d 1387, 1390 (Fed. Cir. 1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. ***A Olympic Forwarder, Inc. v. United States***, 33 Fed. Cl. 514, 518 (1995). It does not follow that if one motion is rejected, the other is necessarily supported. ***Id.*** Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. ***Id.*** (citing ***Corman v. United States***, 26 Cl. Ct. 1011, 1014 (1992)).

As stated above, this court has jurisdiction to hear plaintiffs' claims in respect to one fee land and seven trust lands. Defendant argues in the alternative that, if this court has jurisdiction, plaintiffs have failed to state a claim upon which relief can be granted because they have failed to exhaust administrative remedies. In particular, the leases incorporate by reference regulations that require plaintiffs to file complaints before the Project Manager of WIP. Plaintiffs maintain it would be futile to file a claim with the Project Manager because that claim would certainly be denied.

---

[23] Because defendant relies upon facts beyond plaintiffs' complaint to support its motion to dismiss for failure to state a claim upon which relief can be granted (RCFC 12(b)(4)), defendant's motion to dismiss for failure to state a claim is treated in conjunction with its motion for summary judgment. *See* RCFC 12(b).

The exhaustion doctrine provides that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." ***Meyers v. Bethlehem Shipbuilding Corp.***, 303 U.S. 41, 50-51 (1938); ***McKart v. United States***, 395 U.S. 185, 193 (1969). In cases where a litigant seeks judicial relief before the administrative process is complete, courts commonly apply the exhaustion doctrine to avoid premature interruption of the administrative process. ***McKart***, 395 U.S. at 193. "This court has determined that administrative remedies are not considered to be exhausted until 'a claim is filed, a decision made, and the agency appellate process, at the least, begun.'" ***Lewis v. United States***, 32 Fed. Cl. 59, 64 (1994) (quoting ***Mayne v. United States***, 13 Cl. Ct. 60, 65 (1987)). The exhaustion doctrine "allow[s] an administrative agency to perform functions within its special competence -- to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." ***Parisi v. Davidson***, 405 U.S. 34, 37 (1972) (citations omitted). "The exhaustion doctrine is not, strictly speaking, a matter of jurisdiction." ***San Carlos Irrigation & Drainage District v. United States***, 111 F.3d 1557, 1565 (Fed. Cir. 1997) (quoting ***Allied-General Nuclear Services v. United States***, 839 F.2d 1572, 1575 (Fed. Cir. 1988)).

Despite justifications for the exhaustion doctrine, courts have also created several exceptions. First, "[u]nless made a prerequisite to suit by statute, binding regulation or contract, the extent to which a plaintiff is required to pursue his administrative remedy is a matter for the discretion of the court." ***San Carlos***, 111 F.3d at 1564 (quoting ***Neeley v. United States***, 152 Ct. Cl. 137, 145-46 (1961)); ***see also Sandvik Steel Co. v. United States***, 164 F.3d 596, 600 (Fed. Cir. 1998) ("'where Congress specifically mandates, exhaustion is required,' even 'where Congress has not clearly required exhaustion, sound judicial discretion governs'") (quoting ***McCarthy v. Magidan***, 503 U.S. 140, 145 (1992)). In addition, "if the aggrieved party's action sets forth a constitutional issue, or alleges that the agency acted outside its authority, or establishes that administrative processes would be futile then the aggrieved party may be permitted to obtain judicial review without first seeking administrative review." ***Lewis***, 32 Fed. Cl. at 65 (quoting ***Mayne v. United States***, 13 Cl. Ct 60, 65 (1987)).

As owner of Lot 794 and as lessees to the seven trust lands, plaintiffs were obligated to pay operation and maintenance assessments for the irrigation water. The leases for the trust lands provide:

> 3. OPERATION AND MAINTENANCE ASSESSMENTS - It is understood and agreed that the lessee will pay all operation and maintenance assessments annually in advance on the due date preceding each irrigation season, including any penalties accruing against

> the above-described land under irrigation, and will pay all charges assessed in connection with any other improvement project or district within which the lands may be located, pursuant to the existing or future orders or regulations of the Secretary.[24]

The regulations referenced in the leases are found in Part 171 of Title 25 of the Code of Federal Regulations. As mentioned, this part includes provisions that deal with the distribution and apportionment of irrigation water, the levying of operation and maintenance assessments, and payment of those assessments. Because these regulations deal with the same subject matter and fall under the definition of "existing or future . . . regulations," the court finds that Part 171 is incorporated by reference into the leases and is also applicable to Lot 794 of the fee lands.

Section 171.22, which is found in Part 171, provides a mechanism for property owners to contest matters concerning WIP's delivery of irrigation water. Specifically, this section states that "[a]ll complaints must be made in writing to the Project Engineer or the Officer-in-Charge of the project." 25 C.F.R. § 171.22. Although this section does not explicitly mandate the filing of a complaint prior to filing suit in the Court of Federal Claims, it nevertheless requires complaints to be filed with the Project Engineer or Officer-in-Charge of the project. *Id.*

A search of case law reveals there are no cases in this court or any other jurisdiction that analyze these regulations. This court concludes, however, that Section 171.22 dictates the exhaustion of administrative remedies in the present case. Contrary to plaintiffs' assertion, requiring them to file a complaint before the Project Engineer or Officer-in-Charge of the project would not be futile. As plaintiffs contend, the heart of their complaint is that defendant failed to "equitably distribute the amount of water that was actually present for distribution."[25] The Secretary is mandated by statute and regulation to equitably distribute irrigation water. Given the testimony in the record concerning the complexity behind the equitable distribution of water, and the fact that the events in dispute occurred during a drought, it is clear BIA would have expertise in ascertaining what constitutes a land user's proportionate share of irrigation water. Moreover, the fact that plaintiffs filed a claim under the FTCA before BIA concerning the same operative facts does not change the court's determination. Plaintiffs' previous

---

[24] *See* Def.'s Mot., App. at 32, ¶ 3.

[25] Plaintiffs' Cross Motion For Summary Judgment And Memorandum In Support Thereof And In Opposition To Defendant's Motions at 9.

claim was premised on a negligence theory, in contrast to this case where they assert a breach of contract. This issue has not been raised before BIA, and the court would certainly benefit from a determination by this agency.

Conclusion

For the above-mentioned reasons, Defendant's Motion To Dismiss Or, In The Alternative, Motion For Summary Judgment is DENIED concerning Lot 794 of the fee lands and Lots 1988, 363, 3694, T-1011, 3704 and 3705, 2303 and T-2303, and 361 of the trust lands. Plaintiffs' cross-motion for summary judgment is also DENIED. Defendant's motion to dismiss is GRANTED regarding the remaining fee and trust lands because this court lacks jurisdiction. Pursuant to **RCFC** 54(b), as there is no just reason for delay, the Clerk is directed to dismiss plaintiffs' claims relating to the remaining fee and trust lands.[26]

Moreover, since plaintiffs have failed to exhaust administrative remedies the proceedings in this court are hereby STAYED concerning plaintiffs' claims for Lot 794 of the fee lands and Lots 1988, 363, 3694, T-1011, 3704 and 3705, 2303 and T-2303 and 361 of the trust lands pending review by BIA on plaintiffs' contract claim. Plaintiffs' are advised to file said claim with their Project Engineer or Officer-in-Charge of the project. The parties shall file a report with the Court once the decision by the Project Engineer or Officer-in-Charge has been issued. This report is due within thirty days of the decision.

IT IS SO ORDERED.

Bohdan A. Futey

**BOHDAN A. FUTEY**
**Judge**

---

[26] The remaining fee lands are Lots 299, 300, 596 and 766. The remaining trust lands are Lots 848 and 849, 850, 289, T-290, 1752, T-1131.5B, T-2661A, T-2482 and 2482, 1013A, and 263 and T-263.

**C**
**Oswalt** v. U.S.
C.A.Fed.,2002.
This case was not selected for publication in the Federal Reporter.NOTE: Pursuant to Fed.Cir.R. 47.6, this order is not citable as precedent. It is public record.Please use FIND to look at the applicable circuit court rule before citing this opinion. Federal Circuit Rule 47.6. (FIND CTAF Rule 47.6.)
United States Court of Appeals,Federal Circuit.
A. Dean **OSWALT**, Reinie **Oswalt**, Craig **Oswalt**, Michelle **Oswalt**, Kirk **Oswalt**, and Stacie **Oswalt**, Plaintiffs-Appellants,
v.
UNITED STATES, Defendant-Appellee.
**No. 01-5037.**

July 12, 2002.

Claimants sought review of order of the United States Court of Federal Claims granting United States' motion to dismiss certain of their claims for lack of jurisdiction, and staying proceedings as to remainder. The Court of Appeals held that: (1) district court should have converted government's motion to dismiss for lack of subject matter jurisdiction into motion for failure to state claim or motion for summary judgment, and (2) claimants failed to establish valid contract with United States.

Affirmed, and remanded.

West Headnotes

**[1] Federal Civil Procedure 170A 🔑1825**

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)5 Proceedings
170Ak1825 k. Motion and Proceedings Thereon. Most Cited Cases

**Federal Civil Procedure 170A 🔑2533.1**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)3 Proceedings
170Ak2533 Motion
170Ak2533.1 k. In General. Most Cited Cases
Issue of whether landowners had privity of contract with United States was intertwined with merits of their claim against United States under Tucker Act for breach of agreement for delivery of irrigation water, and thus district court should have converted government's motion to dismiss for lack of subject matter jurisdiction into motion for failure to state claim or motion for summary judgment. 28 U.S.C.A. § 1491(a)(1); RCFC, Rules 12(b)(1, 4), 56, 28 U.S.C.A.

**[2] Waters and Water Courses 405 🔑254**

405 Waters and Water Courses
405IX Public Water Supply
405IX(B) Irrigation and Other Agricultural Purposes
405k254 k. Sale of Water and Supply and Use for Irrigation. Most Cited Cases
Sublessees' payment or agreement to pay water assessments on Indian trust lands did not constitute express or implied contract with United States for delivery of irrigation water, and thus sublessees could not bring suit against United States under Tucker Act for breach of contract, absent showing that Secretary of Interior had approved sublease. 28 U.S.C.A. § 1491(a)(1); 25 C.F.R. §§ 171.14, 171.17(b).

***471** Before NEWMAN, Circuit Judge, ARCHER, Senior Circuit Judge, and LINN, Circuit Judge.

PER CURIAM.
****1** A. Dean Oswalt, Reinie Oswalt, Craig Oswalt, Michelle Oswalt, Kirk Oswalt, and Stacie Oswalt (the "Oswalts") seek review of the order of the United States Court of Federal Claims granting the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

United States' motion to dismiss certain of their ***472** claims for lack of jurisdiction,[FN1] and staying proceedings as to the remainder. *Oswalt v. United States,* No. 97-733C, slip op. (Ct.Cl. Oct. 17, 2000). We *affirm* the judgment of dismissal on other grounds, and *remand* the Oswalts' remaining claims.

FN1. Relating to Lots 299, 300, 596, 766, 848, 849, 850, 289, T-290, 1752, T-1131.5B, T-2661A, T-2482, 2482, 1013A, 263 and T-263.

A party seeking the exercise of jurisdiction under the Tucker Act has the burden of establishing that such jurisdiction exists. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1324 (Fed.Cir.1997). A well-pleaded allegation in the complaint is generally sufficient to overcome challenges to subject matter jurisdiction. *Id.* (citing *Do-Well Mach. Shop, Inc. v. United States,* 870 F.2d 637, 639-40 (Fed.Cir.1989) ("Jurisdiction, therefore, is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could recover.")); *see also Total Med. Mgmt. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997).

However, either a party under RCFC 12(b)(1), or the court on its own motion, may move beyond the complaint to seek a determination of disputed jurisdictional facts. *See Hamlet v. United States,* 873 F.2d 1414, 1415-16 (Fed.Cir.1989) (considering RUSCC 12(b)(1), predecessor to RCFC 12(b)(1), and similar to Fed.R.Civ.P. 12(b)(1)). In such a circumstance, the court may seek the presentation of affidavits or other evidence, and may order additional discovery and a hearing on jurisdictional issues. *See*5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350, at 237 (2d ed. 1990).

Where the resolution of the jurisdictional issue is intertwined with the merits of the case, the decision on jurisdiction should "await a determination of the merits either by the court on a summary judgment motion or by the fact finder at trial." *Id.* at 235-38. Thus, in *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 203 n. 19, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974), the Supreme Court stated that if there was "an identity between the 'jurisdictional' issues and certain issues on the merits," then "under *Land v. Dollar,* 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947), [there would be] no objection to reserving the jurisdictional issues until a hearing on the merits ... [or] to the use, in appropriate cases, of summary judgment procedure to determine whether there is a genuine issue of material fact ...". *See also Pringle v. United States,* 208 F.3d 1220, 1223 (10th Cir.2000) (holding that, because the jurisdictional issues were intertwined with the merits, the district court should have decided the case on summary judgment rather than on a factually-based 12(b)(1) motion to dismiss). We also have recognized this principle. *See Spruill v. Merit Sys. Prot. Bd.,* 978 F.2d 679, 688-89 & n. 12 (Fed.Cir.1992); *cf. Lewis v. United States,* 70 F.3d 597, 603 (Fed.Cir.1995) (holding that Court of Federal Claims should have treated the dismissal of complaint as a dismissal on the merits rather than on jurisdictional grounds).

****2** [1] We therefore hold that the Court of Federal Claims erred in dismissing the Oswalts' claims for lack of jurisdiction rather than on their merits. Jurisdiction in the Court of Federal Claims is supplied by the Tucker Act, which limits jurisdiction to "any claim against the United States founded ... upon any express or implied contract with the United States ..."28 U.S.C. § 1491(a)(1) (1994). In their Amended Complaint, the Oswalts alleged express contracts with the United ***473** States based on the "Applications for Water Rights" and their leases. The Oswalts further alleged an implied contract with the United States, that "[b]y virtue of having paid and or made satisfactory arrangements for payment of irrigation assessments, the plaintiffs were entitled to the delivery of their proportionate share of irrigation water provided by the WIP."Because plaintiffs alleged contracts with the United States, and resolution of the jurisdictional issue of privity of contract under the Tucker Act is intertwined with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the merits of the Oswalts' express and implied breach of contract claims, the Court of Federal Claims should have converted the government's motion to dismiss for lack of jurisdiction either to a motion under RCFC 12(b)(4) for failure to state a claim, or to a summary judgment matter pursuant to RCFC 56.

Even though the Court of Federal Claims did not follow this path, the court nevertheless provided the parties with a full opportunity to present all pertinent materials outside the pleadings regarding the issue of privity, and the parties created a complete record on the issue. We therefore may now proceed to the question as if on summary judgment. *See, e.g., United States v. Sager,* 743 F.2d 1261, 1265-66 (8th Cir.1984).

To establish a valid contract (express or implied), the Oswalts must show a mutual intent to contract including an offer, an acceptance, and consideration. *Trauma Serv. Group,* 104 F.3d at 1325; *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990). An implied-in-fact agreement must be " 'founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding.' " *Trauma Serv. Group,* 104 F.3d at 1326. A contract with the United States also requires that the government representative who entered or ratified the agreement had actual authority to bind the United States. *Id.* at 1325; *City of El Centro,* 922 F.2d at 820. It is the Oswalts' burden to show that the government representative who entered or ratified the agreement had the requisite contracting authority. *City of El Centro,* 922 F.2d at 820-21.

The Oswalts argue on appeal that their payment or agreement to pay water assessments constituted an express or an implied contract with the United States for the delivery of irrigation water. As evidence, they offered an affidavit from Craig Oswalt stating that (1) in June 1994, he and his father met with A.C. Oberly, the Project Administrator for the Wapato Irrigation Project, Bureau of Indian Affairs; (2) Craig Oswalt and his father offered to pay the balance due for irrigation water for 1994 by executing a promissory note; (3) Oberly orally agreed to the arrangement; and (4) the promissory note was later signed and paid.

****3** [2] This testimony is clearly insufficient to demonstrate even a *prima facie* showing of an express contract between the Oswalts and the United States for the supply of irrigation water. An express promise to pay delinquent assessments for land owned or leased by another is distinct from an express offer to pay assessments in exchange for irrigation rights. *See Trauma Serv. Group,* 104 F.3d at 1325 (stating a valid offer is a contractual element on which the plaintiff bears the burden of proof). Instead, we agree with the Court of Federal Claims that the only express contracts with the United States to which the Oswalts were parties were the Applications for Water Rights for the land the Oswalts proved they owned in fee, and the Oswalts' direct leases with the government for the trust lands.

***474** Similarly, the Oswalts have not offered evidence sufficient to create a genuine issue of material fact concerning the formation of an implied-in-fact contract. With respect to plots of trust land the Oswalts sub-leased, we agree with the Court of Federal Claims that the express lease agreements between the original lessee and the government provided privity of contract only to the original lessee for irrigation rights for these plots. *See Oswalt,* slip op. at 11. As to fee lands that the Oswalts leased, we agree with the Court of Federal Claims that the express Applications for Water Rights provide privity with the United States for irrigation rights only to the plots' original owners, heirs and assigns. *See Oswalt,* slip op. at 8-9.

The applicable regulations, incorporated by reference into the government leases, do not contemplate that an implied contract may be formed under the facts specified by the Oswalts. *See Total Med. Mgmt.,* 104 F.3d at 1319 ("[G]overnment contracts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

must comply with statutorily sanctioned regulations"); *see also City of El Centro,* 922 F.2d at 820 (holding that it is the burden of the contracting party to show that the government representative who entered or ratified the agreement had the requisite contracting authority). Rather than authorizing oral applications for water rights on fee lands, 25 C.F.R. § 171.14 (2001) provides that "[t]he Project Engineer is authorized to execute water rights applications submitted by landowners in the project on behalf of the Secretary of the Interior. Such applications should be submitted on the approved Departmental form." The Oswalts offered no evidence that they were landowners of the disputed fee lots, and no evidence that they submitted applications on the approved form.

As to leases of trust lands, the regulations provide that "[w]ater will not be delivered to Indian trust or restricted lands that are under lease approved by the Secretary of the Interior or his authorized representative acting under delegated authority until the lessee has paid the annual assessed operation and maintenance charges." 25 C.F.R. § 171.17(b) (2001). The Oswalts have offered no evidence that they are lessees of the relevant trust lands under an approved lease. The regulations further provide that, as a precondition to the delivery of water, the operation and maintenance assessments are to be paid, or payment is to be arranged, in a timely fashion. *Id.* The Oswalts do not dispute that the operations and maintenance assessments they paid in 1994 were late. Therefore, the Oswalts cannot establish the obligation by the government to deliver water, or consequently, a breach of that obligation.

****4** Because we have determined that the Court of Federal Claims erred in determining that it lacked jurisdiction over this case, we need not consider the Oswalts' remaining arguments as to jurisdiction.

Finally, we do not reach the Oswalts' exhaustion claims with respect to the remaining lots because we lack jurisdiction to review them. A stay order "should not ordinarily be viewed ... as 'final' and thus within the jurisdiction of an appellate court [unless] ... it effectively puts the parties out of ... court, either permanently because it terminates the action as a practical matter, or, as some courts have held, for a protracted or indefinite period." *Gould v. Control Laser Corp.,* 705 F.2d 1340, 1341 (Fed.Cir.1983). In *Gould,* we held that we lacked jurisdiction to review a stay entered by the district court that had been designed to allow the Patent and Trademark Office to proceed with a patent reexamination. *Id.* Similarly to the district***475** court in *Gould,* the Court of Federal Claims stayed the present action to allow the Oswalts to exhaust their administrative remedies as to their remaining claims. Therefore, there is no final appealable decision by the Court of Federal Claims as to these claims, and we lack jurisdiction to review them.

No costs.

C.A.Fed.,2002.
Oswalt v. U.S.
41 Fed.Appx. 471, 2002 WL 1499753 (C.A.Fed.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Velikanje | Moore & Shore, P.S.**
attorneys at law
**VMS**

John S. Moore
Morris G. Shore
George F. Velikanje
Alan D. Campbell
James C. Carmody
Carter L. Fjeld
J. Jay Carroll
Mark E. Fickes
Douglas L. Federspiel
Brendan V. Monahan
Kevan T. Montoya
Nancy L. Livingston
Metiner G. Kimel
Travis W. Misfeldt
Garon K. Jones
James S. Elliott
Sarah L. Wixson

May 12, 2003

Project Engineer/Officer-In Charge
Wapato Irrigation Project
P.O. Box 220
Wapato, Washington 98951

Re: Oswalt Notice of Written Complaint

Dear Sir or Madam:

Enclosed you will find the original and one copy of Notice of Written Complaint in the above-referenced matter.

Sincerely,

VELIKANJE, MOORE & SHORE, P.S.

J. Jay Carroll

JJC/313691b
Enclosures

405 East Lincoln Avenue P.O. Box 22550 Yakima, WA 98907 (509) 248-6030 fax (509) 453-6880 www.vmslaw.com

## NOTICE OF WRITTEN COMPLAINT

COMES NOW A. DEAN OSWALT and REINIE OSWALT, husband and wife; CRAIG OSWALT and MICHELLE OSWALT, husband and wife; and KIRK OSWALT and STACIE OSWALT, husband and wife, (hereinafter referred to as the "claimants") and pursuant to 25 C.F.R. § 171.22 submit the following written complaint to the Project Engineer and/or Officer-in-Charge of the Wapato Irrigation Project.

In 1994, the claimants either owned or had an interest in certain lands within the Yakama Indian Nation within the Wapato Irrigation Project denoted as allotments 1988, 363, 3694, T-1011, 3704, 3705, 2303, T-2303 and 361. During the irrigation season of 1994, in particular, between June 10, 1994 and July 24, 1994, the claimants were not provided with their proportionate share of irrigation water from the Wapato Irrigation District for application to the above referenced allotments.

The Claimants have instituted suit against the United States by and through the Bureau of Indian Affairs, Wapato Irrigation Project for the failure to provide the claimants' pro rata share of irrigation water in 1994. By Order of the Court, the claimants have been ordered to exhaust their administrative remedies with respect to this claim. Thus, in conformance with 25 C.F.R. § 171.22, claimants submit this written complaint to the Project Engineer and/or the Officer-in-Charge of the Wapato Irrigation District with regard to the Wapato Irrigation Project's failure to deliver the claimants' pro rata share of water to them during the 1994 irrigation season.

If the Project Engineer and/or the Officer-in-Charge accepts this complaint so that there is no dispute between the parties, the claimants will submit damage computations arising from the lack of irrigation water. If Project Engineer and/or the Officer-in-Charge

disputes the complaint, the claimants will, pursuant to 25 C.F.R. § 171.23, appeal the decision to the Area Director.

DATED this 12th day of May, 2003.

VELIKANJE, MOORE & SHORE, P.S.
Attorneys for Claimants

By: ______________________
J. Jay Carroll, WSBA No. 17424

405 East Lincoln Avenue
P.O. Box 22550
Yakima, Washington 98907

(509) 248-6030

IN REPLY REFER TO:

**United States Department of the Interior**
**BUREAU OF INDIAN AFFAIRS**
**Wapato Irrigation Project**
**P.O. Box 220**
**Wapato, Washington, 98951**

November 16, 2004

Velikanje, Moore & Shore, P.S.
405 East Lincolne Avenue
P.O. Box 22550
Yakima, WA 98907

Re: Oswalt Notice of Written Complaint

Dear Sir or Madam:

The Wapato Irrigation Project has received the 'Notice of Written Complaint' of A. Dean Oswalt and Reinie Oswalt, Craig Oswalt and Michelle Oswalt, and Kirk Oswalt and Stacie Oswalt (Oswalts) according to 25 CFR § 171.22. The Oswalts' claim that they did not receive the proper amount of water for allotments 1988, 363, 3694, T-1011, 3704, 3705, 2303, T-2303 and 361, between June 10 and July 24 of the irrigation season of 1994.

The U.S. Department of the Interior, Bureau of Indian Affairs (BIA), Wapato Irrigation Project (WIP) operates and maintains a network of irrigation facilities and watercourses that serve approximately 140,000 acres of irrigated land on the Yakama Reservation. The primary source of irrigation water for the WIP is diverted from the Yakima River via Wapato Dam located about a mile downstream of Union Gap, Washington.

The Oswalts' listed parcels are located in the lower Wapato and Satus Units approximately 22.50 miles from the Wapato Dam. The irrigation water must travel approximately 35.00 miles through the Bench Unit and Wapato Unit before it enters the Satus Unit. The Satus Unit of the WIP was designed to operate from drain water off the Bench and Wapato Units. In times of low water the Satus Units are affected more than the other units on the reservation.

The Yakama Reservation was experiencing one of the worst droughts on record during the 1994 growing season. The drought placed a severe burden on the WIP to deliver a sufficient supply of water to all of the farmlands within the project. The farmlands within the lower Wapato and Satus Units were especially difficult because they lie at the end of the WIP and rely primarily on return flow. The WIP has a unique design for water delivery to the lower Wapato and Satus Units. The upper Wapato and Bench Units use the irrigation water first. The unused irrigation water and field runoff are recovered through a drain system and sent to the lower Wapato and Satus Units. This irrigation water is referred to as return flow and is available for use a second time.

RECEIVED NOV 1 8 2004



EXHIBIT A

On May 18, 1994, the U.S. Bureau of Reclamation notified all Yakima Basin Irrigation District managers that each District would receive only 34% of their 100% pro-ratable storage water entitlements for the 1994 season. Normally WIP may divert at the Wapato Dam 1896 cubic feet per second (CFS), 2029 cfs, and 1915 cfs respectively for the months of June, July, and August. Of those monthly diversions, 720 cfs is non-pro-ratable and received at 100 %. The remainder of the diversions would be reduced to 34 % of the 100 % normal amount. Thus for June, July, and August of 1994 WIP received respectively 59 % (1120 cfs), 57 % (1165 cfs), and 59 % (1126 cfs) of the normal allocation of water for those months.

As a result of the Bureau of Reclamation notification, the Project Engineer/Officer-in-Charge of WIP began to establish countermeasures against the drought. Mr. Harry Cartmell was hired on June 1994, as a trouble shooter to help solve the water shortage on the WIP. Mr. Cartmell took immediate action. In the lower Wapato and Satus Units, Mr. Cartmell developed a water distribution plan. He instituted a 5 day on 5 day off rotation which allowed delivery of irrigation water to fields receiving little or no water prior to the rotation. He had a pump installed in a drain and another pump in a gravel pit in the Satus Unit to improve the water supply in the area of the Oswalts. These countermeasures were done in accordance to 25 CFR § 171.6 (a) Distribution and apportionment of water.

The WIP system has few water measurements structures at the delivery point on the boundary of each farm unit. The lower Wapato and Satus Units are located on very flat terrain which makes it more difficult to establish water measurement structures at the delivery point. Water measurement requires elevation difference. Most of the lower Wapato and Satus Units do not have water measurement structures due to the lack of elevation difference. Therefore, it is difficult to measure precisely the amount of water that the Oswalts received on the lower Wapato and Satus Units. To determine how much irrigation water was in the main laterals in the lower Wapato and Satus Unit, Mr. Cartmell acquired a device called a pendulum weir that was portable and required minimal elevation difference. Several of these were used successfully to measure irrigation water and equitably distribute the meager supply.

Operation and Maintenance (O&M) Assessment.

The Bureau of Indian Affairs (BIA), Yakama Agency, Realty Office forwards Leases to the WIP Billing & Collection Office. Leases are checked and encoded in the Nation Irrigation Information Management System (NIIMS) located in Denver, Colorado. All O&M Assessments (owners/lessees) are mailed from NIIMS Denver. Lessee/Owner mail or hand deliver payments to WIP Billing & Collection Office, Yakama Agency. Payments are encoded into NIIMS Denver, then receipts and ditch rider reports are generated after the collection is posted. Lessees/Owners are then cleared to place water delivery orders through the WIP Headquarters. No water is delivered until payment is made in accordance with 25 CFR § 171.17 A & B.
25 CFR § 171.2. The irrigation season, when water shall be available for irrigation, will be established by the Officer-in-Charge. The WIP began delivery of water April 1, 1994. WIP O&M Assessments for 1994 were mailed March 15, 1994 with a due date of April 1, 1994.

Specific Allotments

The Allotments located on the WIP could have either 'A' Water, 'B' Water or both.

'A' Water: - 1905 Secretarial Order gives Yakama Nation 147 CFS free flow from Yakima River.
- 1914 Congressional Act 38 stat. 582 of August 1, 1914 gives Yakama Nation 573 free flow from Yakima River.
- Memorandum Agreement September 3, 1936 for 100,000 acre feet of prorate able storage water. Paid by appropriated monies.

Total 'A' Water 720 CFS river free flow with no storage fees.
Total 'A' Water 100k Acre Feet with storage fees paid by appropriation.

'B' Water: - Memorandum Agreement of March 9, 1921 for 250,000 acre feet of prorate able storage water.

Total 'B' Water 250k Acre Feet. Storage fees included with O&M collections.

In accordance with 25 CFR § 171.6 Distribution and apportionment of Water, the Officer-in-Charge determined that the Satus District is to receive 1 CFS per 55 acres during a normal year.

After the BOR notification for 1994 that all reservoir storage entitlements would be reduced to 34% of full entitlement, the Project Engineer computed that 'A' Land must be prorated to 71% of full entitlement and 'B' Land to 30% of full entitlement for the 1994 season. The Satus Unit computes as follows:

| | | |
|---|---|---|
| SATUS | 1 cfs per 55 acres @ 100% | A: 1 cfs per 78 acres @ 34% |
| | | B: 1 cfs per 183 acres @ 34% |

The WIP's Operation and Maintenance (O&M) Assessment records for the dates of the Complaint, June 10 to July 24, 1994 show the following:

Allotment 361 ( 39.48 acres A, 12.79 acres B, = 52.27 acres) is located 21.88 miles from the Wapato Dam and is serviced by the W 40 Lateral. Allotment 361 was paid by the Oswalts on 4/29/1994 and eligible to receive irrigation water for the 1994 Season. Allotment 361 was allocated 0.58 cfs out of a normal amount of 0.95 cfs during the dates listed thus receiving 71% of 'A' Water and 30% 'B' Water at the allocated 34% under the drought conditions.

Allotment 363 ( 32.60 acres A, 32.72 acres B, = 65.32 acres ) is located 22.63 miles from the Wapato Dam and is serviced by the W 50 Lateral. Allotment 363 was paid by the Oswalts on 4/29/1994 and eligible to receive irrigation water for the 1994 Season. Allotment 363 was allocated 0.60 cfs out of a normal amount of 1.19 cfs during the dates listed thus receiving 71% of 'A' Water and 30% 'B' Water at the allocated 34% under the drought conditions.

Allotment 3694 ( 40.00 acres A, 0.00 acres B, = 40.00 acres) is located 26.75 miles from the Wapato Dam and is serviced by Satus 3 Plant by pipeline P-500. Allotment 3694 was paid by a third party on 5/16/1994 and eligible to receive irrigation water for the 1994 Season. Allotment 3694 was allocated 0.52 cfs out of a normal amount of 0.72 cfs during the dates listed thus receiving 71% of 'A' Water at the allocated 34% under the drought conditions.

Allotment 1988 ( 40 acres A, 25.35 acres B, = 65.35 acres) is located 19.75 miles from the Wapato Dam and is serviced by the Lateral 4 Extension. An 8 inch and 6 inch Diesel pumps (1800 Gallon per Minute [GPM] and 1400 GPM) were installed 7/14/94. These were provided by a neighbor. Allotment 1988 was paid by the Oswalts on 6/23/1994 well into the season and during time of the Complaint. The allotment was not eligible to receive irrigation water for the 1994 Season. Allotment 1988 was allocated 0.65 cfs out of a normal 1.19 cfs during the dates listed therefore, the Oswalts received 71% of 'A' Water and 30% 'B' Water that they were not entitled to receive.

Allotment T-1011 ( 39.50 acres A, 40.00 acres B, = 79.50 acres) is located 19.50 miles from the Wapato Dam and is serviced by the Lateral 4 Extension. The Parton Well and drain pump (1400 GPM and 1800 GPM) added 3200 GPM was provided on 6/02/94. An 8 inch and 6 inch Diesel rental pump (1800 GPM and 1400 GPM) added 3200 GPM was provided on 7/08/94. Allotment T-1011 O&M Assessment was delinquent and not paid during the time of the Complaint. The allotment was not eligible to receive water for the 1994 Water Season. A Promissary Note dated August 31, 1995 for the 1995 Water Season included this allotment for the 1994 Water Season and was paid on 12/27/1995. Allotment T-1011 was allocated 0.73 cfs out of a normal 1.45 cfs during the dates listed therefore, the Oswalts received 71% of 'A' Water and 30% 'B' Water that they were not entitled to receive.

Allotment 3704 ( 35.00 acres A, 0.00 acres B, = 35.00 acres) is located 24.88 miles from the Wapato Dam and is serviced by the East Lateral and E-248 Canal. Allotment 3704 O&M Assessment was delinquent and not paid during the time of the Complaint. The allotment was not eligible to receive water for the 1994 Water Season. A Promissary Note dated August 31, 1995 for the 1995 Water Season included this allotment for the 1994 Water Season and was paid on 12/27/1995. Allotment 3704 was allocated 0.45 cfs out of a normal 0.64 cfs during the dates listed therefore, the Oswalts received 71% of 'A' Water that they were not entitled to receive.

Allotment 3705 ( 30.00 acres A, 0.00 acres B, = 30.00 acres) is located 24.63 miles from the Wapato Dam and is serviced by the East Lateral and E-248 Canal. Allotment 3705 O&M Assessment was delinquent and not paid during the time of the Complaint. The allotment was not eligible to receive water for the 1994 Water Season. A Promissary Note dated August 31, 1995 for the 1995 Water Season included this allotment for the 1994 Water Season and were paid on 12/27/1995. Allotment 3705 was allocated 0.39 cfs out of a normal 0.55 cfs during the dates listed therefore, the Oswalts received 71% of 'A' Water that they were not entitled to receive.

Allotment 2303, same Allotment T-2303 ( 40.00 acres A, 5.00 acres B, = 45.00 acres) is located 20.00 miles from the Wapato Dam and is serviced by the Lateral 4 Extension. An 8 inch Diesel rental pump of 1800 GPM was installed on 7/14/94 and the Wagon Wheel Pump of 900 GPM

provided on demand. Allotment 2303 (T-2303) O&M Assessment was delinquent and not paid during the time of the Complaint. The allotment was not eligible to receive water for the 1994 Water Season. A Promissory Note dated August 31, 1995 for the 1995 Water Season included this allotment for the 1994 Water Season and were paid on 12/27/1995. Allotment 2303 (T-2303) was allocated 0.54 cfs out of a normal 0.82 cfs during the dates listed therefore, the Oswalts received 71% of 'A' Water and 30% 'B' Water that they were not entitled to receive.

For Allotments 1988, T-1011, 3704, 3705, 2303, T-2303, the Oswalts were entitled to no water yet they received either 71% of 'A' Water, 30% 'B' Water or both that they were not entitled to. For Allotments 361, 363, 3694, the Oswalts received 71 % of full entitlement for 'A' Land and 30 % of full entitlement for 'B' Land water which was all that was available for June 10 - July 24, 1994. Thus the Oswalts' were only entitled to receive water for three of the allotments (361, 363, 3694) listed in their complaint. The amount of water the Oswalts received for those three allotments was the same amount that other users in the Satus Unit received due to drought. This amount was all that was available and was approved by the Project Engineer for the entire WIP area. For these reasons, the Oswalts complaint is denied.

If you are dissatisfied with this decision, you have the right to appeal according to 25 CFR § 171.23.

Sincerely,

Pierce R. Harrison
Project Administrator

IN REPLY REFER TO:

United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Northwest Regional Office
911 N.E. 11th Avenue
Portland, Oregon 97232-4169

TAKE PRIDE IN AMERICA

NOV 1 2005

Mr. J. Jay Carroll
405 East Lincoln Avenue
Post Office Box 22550
Yakima, Washington 98907

Dear Mr. Carroll:

**I. DECISION APPEALED FROM**

By memorandum dated November 16, 2004 the Wapato Irrigation Project (WIP) Administrator denied the complaint of Dean and Renie Oswalt, Graig and Michelle Oswalt, Kirk and Stacie Oswalt (Oswalts). The allotments for which you allege water was not available are 1988, T-1011, 3704, 3705, 2303, 361, 363, and 3694.

We have reviewed your appeal of the WIP Administrator's decision dated November 16, 2004, pertaining to your complaint that you did not receive the proper amount of water during the 1994 irrigation season.

**II. INITIATION OF APPEAL**

On December 16, 2004 you appealed the WIP Administrator's November 16, 2004 decision to deny your claim. Your appeal was timely filed.

**III. ISSUES RAISED ON APPEAL**

Two arguments are raised by your appeal. The first is that by virtue of the promissory notes that were executed to pay the O&M bills you believe that you were entitled to receive irrigation water for the allotments that you own or lease. The second argument is that little or no water was available between June 10, 1994 and July 24, 1994.

Analyzing the first argument requires a review of the applicable regulations regarding payment of O&M bills. The second argument requires a look at the physical conditions affecting the delivery of water to WIP as a whole and the actions taken in response to those conditions.

RECEIVED NOV - 3 2005

EXHIBIT "B"

## IV. ANALYSIS OF ISSUES

The WIP Administrator's decision states that allotments 1988, T-1011, 3704, 3705, and 2303 were not eligible to receive water because the Operation and Maintenance (O&M) bills had not been paid in a timely manner. Your appeal states that there is no dispute that the appellants made arrangements with the Acting Project Administer for the payment of the water assessments and that because of those promissory notes you were eligible to receive irrigation water. We disagree that there is no dispute on this issue. We agree that the Oswalts signed promissory notes for the allotments listed above for the 1994 O&M bills. What is clear from the enclosures that are a part of Mr. B.A. Domondon's declaration dated June 27, 1997 is that arrangements for paying the 1994 O&M bills did not occur until August 31, 1995.

Mr. Acey Oberly's declaration dated May 26, 2005 states that he did not sign or draft any promissory notes for the 1994 irrigation season. Mr. Oberly's declaration is supported by the February 15, 1994 memorandum from the Office of the Solicitor and concurred by the Portland Area Director (enclosed). This memorandum changed the promissory note process such that the Wapato Irrigation Project and its employees had no authority to create or execute promissory notes for the 1994 irrigation season. Thus, as is made clear in his declaration, Mr. Oberly as Project Engineer never drafted any promissory notes for the Oswalts for the 1994 irrigation season, nor did he have the authority to do so. You have acknowledged that the U.S., acting through the Project Engineer, reserves the right to refuse delivery of any water to the land upon the failure of the landowner to promptly pay the irrigation charges. Your pleadings before the court acknowledged your obligation to pay O&M bills for those tracts that you own or lease.

The regulations at 25CFR 171 govern operation and maintenance of Indian irrigation projects. The record shows that arrangements for payment of the allotments listed above were not made until well after the 1994 irrigation season. Promissory notes that are executed after the irrigation season do not authorize you to receive irrigation water for that season. Undocumented claims that you made arrangements to pay still do not entitle you to irrigation water. In reviewing your appeal and the claims asserted concerning payment for the water assessments, we requested additional information from you concerning promissory notes. In your July 1, 2005 response you admit that no promissory notes were signed in 1994.

The regulations of Part 171.17(a) clearly state that water will not be delivered until annual O&M assessments are paid. By regulation, you were not entitled to receive water to allotments 1988, T-1011, 3704, 3705, and 2303.

For the remaining three allotments (361, 363, and 3694) for which you did pay operation and maintenance charges in accordance with the regulations, water must travel approximately 21.9 miles, 22.6 miles, and 26.8 miles respectively from the initial point of diversion from the Yakima River (Wapato Dam) to the allotments in question. Before the water reaches the three allotments, it is used higher up in the irrigation project by other users. The unused irrigation water is collected by a drain system and is finally delivered to the lower Wapato and Satus Units through Lateral 4 extension which serves allotments 361, 363, and 3694. During a drought, the amount available in the upper portion of the system is reduced which then reduces the amount available in the lower portion of the project.

In the affidavit provided by Donald Schramm of the Bureau of Reclamation, reference is made to the drought of 1994 for the months of June, July, August, and September as being the worst on record. Water availability for this four month period was 34%, 39%, 39%, and 37% respectively during this time. His affidavit goes on to further say that the Bureau of Reclamation was unable to deliver adequate quantities of water for irrigation to all users throughout the 1994 irrigation season because of the drought.

In the affidavit provided by B.J. Howerton, also of the Bureau of Reclamation, is a statement similar to that of Donald Schramm. In this affidavit water year 1994 is described as the lowest water supply year for the Yakima Basin during the last 50 years. Mr. Howerton's affidavit further states that farmers served by WIP, residents of the Yakama Indian Reservation, and fish and wildlife were all adversely affected by the drought conditions.

Allotments 361, 363, and 3694 were eligible to receive irrigation water during the 1994 irrigation season because the O&M bills were paid in a timely manner according to 25CFR 171.17. Because of the severe drought, WIP took extra steps to deliver water to all eligible users. During the months of June and July, several pumps and one well were rehabilitated and used to supplement the irrigation water to Lateral 4 extension which serves allotments 361, 363, and 3694. In all, the emergency actions that were taken served to make available at least 1 well and 6 pumps to supplement water to Lateral 4 extension. Water availability appears to have increased after WIP introduced these emergency measures (See affidavit of Mr. Harry Cartmell dated June 27th, 1997). During the extreme drought of 1994, WIP took extra measures to attempt to alleviate the effects of the drought and from the evidence, it appears that these efforts resulted in the water being delivered which otherwise may not have reached the end of the Lateral 4.

Mr. Pierce Harrison's decision dated November 16, 2004 describes the methodology used to compute the water that was to be delivered to each allotment. Allotments served by WIP may have up to two types of water: "A" water and/or "B" water. "A" water is administratively determined from 3 different sources including a 1905 Secretarial Order, a 1914 Congressional Act, and a 1936 Memorandum Agreement. The portion of the "A" water that is derived from the 1936 Memorandum Agreement can be prorated subject to water availability as determined by the Bureau of Reclamation. "B" water is administratively determined from a 1921 Memorandum Agreement and can be prorated in its entirety subject to water availability as determined by the Bureau of Reclamation. In summary, portions of "A" water and all of "B" water may be prorated based on availability. In 1994, the Bureau of Reclamation notified all Yakima River water users (including WIP) that only 34% of storage entitlement would be available. This reduction affected both "A" and "B" water. The Officer-in-Charge at WIP, in accordance with 25 CFR § 171.6(a), apportioned the available water to each allotment based on the availability of water and on the percentage of "A" water and "B" water that each allotment was entitled to.

In your notice of appeal dated December 16, 2004, you allege that someone admitted that "WIP had made an error in calculating how much water should be allowed to flow into the canal: Notice of Appeal, Ex.C, p.7, and that was why there was a lesser amount of water in the canal between June 10th and July 24th. The Bureau denies that any error was made in calculating the amount of water to go into the canals and in fact, extra measures were taken to ensure that eligible users received water during the drought.

You also claim that it is undisputed you received no water between June 10, 1994 through July 24, 1994. That statement is disputed by materials you have submitted. Your declaration dated May 12, 1997 states that your crops went "essentially without any or very little irrigation water" during the time in question. [1]

Additionally, we note that Mr. Harry Cartmell's supplemental declaration dated June 30, 1997 states that pumps were installed to serve (among others) allotments 1011, 1988, 2303. Even though you were not entitled to irrigation water for these allotments, actions taken by WIP actually provided you with an opportunity to receive water for land you farmed that was not legally eligible to receive irrigation water.

## V. DECISION

In a drought year water shortages are typical, especially at the end of an irrigation system where your lands were located. In the case of the Satus area of the WIP, the availability of irrigation water is dependant on the return flows from higher up in the system. Anything that lessens the availability of water higher up in the system will cause a shortage of water at the end of an irrigation system. The drought year of 1994 has been well documented. The emergency actions taken by WIP and others have also been well documented. For the 3 allotments that you were entitled to water, you received the proportionate amount of water during the 1994 drought that was available. Given the extraordinary conditions presented by the 1994 drought and the emergency actions taken, we can find no basis for reversing the Project Administrators decision.

The WIP administrator's decision is also upheld because you did not pay the O&M assessments for tracts 1988, T-1011, 3704, 3705, and 2303 before the 1994 irrigation season in violation of federal regulations. For these reasons, the WIP Administrator's decision is upheld.

## VI. NOTICE OF RIGHT TO FURTHER APPEAL

This decision may be appealed to the Interior Board of Indian Appeals located at the address below in accordance with the regulations in 43 CFR 4.310-4.340.

Interior Board of Indian Appeals
801 North Quincy Street
Suite 300
Arlington, Virginia 22203

Your notice of appeal to the Board must be signed by you or your attorney and must be mailed within 30 days of the date you receive this decision. It should clearly identify the decision being appealed. If possible, enclose a copy of the decision. You must send copies of your notice of

---

[1] Section XXI of the amended complaint dated April 17, 1998 states that little or no water was received from the WIP. Section XXIII however, states that at the same time, other farmers on the same canals were receiving irrigation water sufficient to water their crops. This contradiction indicates that water was available during the time in question.

appeal to (1) the Assistant Secretary – Indian Affairs, MS 4140-MIB, U.S. Department of the Interior, 1849C Street, N.X. Washington D.C. 20240, (2) each interested party known to you, and (3) this office. Your notice of appeal sent to the Board of Indian Appeals must certify that you have sent copies to these parties. If you file a notice of appeal, the Board of Indian Appeals will notify you of further appeal procedures.

If no appeal is timely filed, this decision will become final for the Department of the Interior at the expiration of the appeal period. No extension of time may be granted for filing a notice of appeal.

Sincerely,

Northwest Regional Director

Enclosures

cc: Thomas D. Dinackus (w/enclosures)
Civil Division, Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street N.W.
Washington, D.C. 20530

Mary Anne Kenworthy (w/enclosures)
U.S. Department of the Interior
Office of the Solicitor
Pacific Northwest Region
500 N.E. Multnomah St. #607
Portland, Oregon 97232

Pierce Harrison (w/enclosures)
Wapato Irrigation Project

# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF INDIAN APPEALS
801 NORTH QUINCY STREET
SUITE 300
ARLINGTON, VA 22203

| | | |
|---|---|---|
| DEAN AND RENIE OSWALT, CRAIG AND MICHELLE OSWALT, AND KIRK AND STACIE OSWALT, Appellants, | : | Order Docketing and Dismissing Appeal |
| v. | : | Docket No. IBIA 06-23-A |
| NORTHWEST REGIONAL DIRECTOR, BUREAU OF INDIAN AFFAIRS, Appellee. | : | December 13, 2005 |

On December 6, 2005, the Board of Indian Appeals (Board) received a notice of appeal from Dean and Renie Oswalt, Craig and Michelle Oswalt, and Kirk and Stacie Oswalt (Appellants). Appellants seek review of a November 1, 2005 decision of the Northwest Regional Director, Bureau of Indian Affairs (Regional Director; BIA), which denied Appellant's complaint that BIA's Wapato Irrigation Project (WIP) failed to deliver the proper amount of water to Appellants' lands during the 1994 irrigation season. The Board dismisses this appeal for lack of jurisdiction.

Appellants allege that WIP failed to deliver irrigation water to their lands for a 45-day period in 1994 and that their crops yields were reduced as a result of such failure. Appellants "seek compensation for this loss." Notice of Appeal, Ex. C at 2 (Statement of Reasons); see also id. at 6-7.

The sole relief sought by Appellants in their notice of appeal is for compensation. The Board does not have jurisdiction over damages claims against the Department. See Brurud v. Eastern Oklahoma Regional Director, 38 IBIA 51, 55 (2003) (Board lacks jurisdiction to award damages against BIA); Toyon Wintu Center, Inc. v. Sacramento Area Director, 29 IBIA 290, 295 (1996) (whether appellant's theory is one of tort or breach of contract, the Board lacks jurisdiction if appellant seeks damages).

Even if Appellants' notice of appeal could be construed as limited to seeking a declaratory judgment from the Board concerning the Regional Director's decision, we would dismiss this appeal. First, the appeal would be moot because a favorable decision by

the Board would have no effect on Appellants' ability to obtain water for the 1994 irrigation season. See Brown v. Navajo Regional Director, 41 IBIA 314, 318 (2005) ("[m]ootness may occur when nothing turns on the outcome of an appeal"), and cases cited therein. Second, the Board does not issue advisory opinions. See Umpqua Watersheds, Inc. v. Northwest Regional Director, 38 IBIA 10, 11 (2002); Jackson v. Muskogee Area Director, 32 IBIA 45, 47 (1998).

Therefore, pursuant to the authority delegated to the Board of Indian Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the Board dockets this appeal but dismisses it for lack of jurisdiction. 1/

I concur:

Steven K. Linscheid
Chief Administrative Judge

Katherine J. Barton
Acting Administrative Judge

1/ Appellants' Statement of Reasons refers to "ten years [of] litigation [that] has been pending" regarding this dispute, Notice of Appeal, Ex. C at 6, and documents submitted by Appellants include a December 18, 1998 affidavit of Craig Oswalt filed in Oswalt, et al. v. United States, No. 97-733 C (Fed. Cl.) and a May 12, 1997 declaration of Dean Oswalt filed in Oswalt et al. v. United States, No. CY-96-3133-AAM (E.D. Wash.). Appellants do not otherwise describe or explain the status of their federal court litigation.

TRUST LAND

# LEASE NO 1-7859

# ALLOTMENT 361

allot 361

Form 5-5441
(PAO Revised
Oct 1971)

124 17856

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS

☑ DATE MAR 15 1993 INITIAL

☑ Lessee Copy
☑ Lessor Copy
☑ SMC Copy

FARMING
# LEASE

Allotment No. T361-D,G,H

Lease No. 1-1-7859-9393

YAKIMA Indian Agency

Contract No.

THIS CONTRACT, made and entered into this 9th day of November, 19 92, by and between the Indian or Indians named below (the Secretary of the Interior acting for and on behalf of Indians), hereinafter called the "lessor," and A. Dean Oswalt PHONE #854-1889 of 541 Chausee Road, Granger, WA 98932, hereinafter called the "lessee," in accordance with the provisions of existing law and the regulations (25 CFR 162) which, by reference, are made a part hereof, WITNESSETH: That for and in consideration of the rents, covenants, and agreements hereinafter provided, the lessor hereby lets and leases unto the lessee the land and premises described as follows, to wit:

(AL. T361-H): Part of Lot 2 lying SW of Hwy 22 (except homesites in SE corner) Sec. 4, (AL. T361-G): That part of Lot 1 North and East of centerline of Highway 22, Sec. 4, T. 9 N., R. 21 E., W.M., WA, described as follows: beginning at the NW corner of Lot 1; thence East along the N. boundary 200 ft.; thence South 217.8 ft.; thence W. 200 ft. to W. boundary of Lot 1; thence N. along W. boundary 217.8 ft. to TPOB, containing 1 acre, more or less.

containing 55.10 acres, more or less, of which not to exceed SEE SMC / FARM PLAN acres may be cultivated, for the term of One (1) years, beginning on the first day of JANUARY, 19 93, fully to be completed and ended on the LAST day of DECEMBER, 19 93, subject to the conditions hereinafter set forth. The lessee, in consideration of the foregoing, covenants and agrees, as rental for the land and premises, to pay $ 4,200.00 (one ~~share of all crops as hereinafter provided~~) per annum:

| TO— | DATE DUE | AMOUNT |
|---|---|---|
| BUREAU OF INDIAN AFFAIRS | On or before 12/1/92 | $4,200.00 |
| Yakima Indian Agency | | |
| P.O. Box 632 | | |
| Toppenish, WA 98948 | | |

EXECUTION FEE: $210.00

In the event of the death of any of the owners to whom, under the terms of this lease, rentals are to be paid direct, all rentals remaining due and payable shall be paid to the official of the Bureau of Indian Affairs having jurisdiction over the leased premises. This provision is applicable only while the leased premises are in trust or restricted status.

While the leased premises are in trust or restricted status, the Secretary may in his discretion, and upon notice to the lessee, suspend the direct rental payment provisions of this lease in which event the rentals shall be paid to the official of the Bureau of Indian Affairs having jurisdiction over the leased premises.



★ GPO 594-597



RDB/flr

124 17856

This lease is subject to the following provisions:

1. "SECRETARY" as used herein means the Secretary of the Interior or his authorized representative.

2. INTEREST.—It is understood and agreed between the parties hereto that, if any installment of rental is not paid within 30 days after becoming due, interest at the rate of 6 percent per annum will become due and payable from the date such rental became due and will run until said rental is paid.

3. OPERATION AND MAINTENANCE ASSESSMENTS.—It is understood and agreed that the lessee will pay all operation and maintenance assessments annually in advance on the due date preceding each irrigation season, including any penalties accruing against the above-described land under irrigation, and will pay all charges assessed in connection with any other improvement project or district within which the lands may be located, pursuant to the existing or future orders or regulations of the Secretary.

4. REPAIRS.—It is understood and agreed that the lessee is to keep the premises covered by this lease in good repair, and the said lessee will be responsible for all damages done to buildings and fences and other improvements, except the usual wear and decay.

5. CROP LEASES.—It is understood and agreed that the lessee will not purchase or be a party to the purchase by anyone, of the lessor's share of the crop, without prior approval of the Secretary.

6. SUBLEASES AND ASSIGNMENTS.—Unless otherwise provided herein, a sublease, assignment or amendment of this lease may be made only with the approval of the Secretary and the written consent of all parties to this lease, including the surety or sureties.

7. RESERVATIONS.—It is understood and agreed that the lessor reserves the right to make oil and gas leases, grant rights of way and other legal grants, on the premises covered by this lease and that in event such a lease or grant is made, the lessee hereunder shall be entitled to damages for the actual loss sustained by him on account of said lease or grant, and to nothing more. It is further understood that in the event of a dispute between the lessee hereunder and the lessee or permittee under any oil and gas lease, right-of-way, or other grant, as to the amount of such actual damages the matter will be referred to the Secretary who shall be the sole and final judge as to the amount of the said damages.

8. UNLAWFUL CONDUCT.—The lessee agrees that he will not use or cause to be used any part of the leased premises for any unlawful conduct or purpose.

9. RELINQUISHMENT OF SUPERVISION BY THE SECRETARY.—Nothing contained in this lease shall operate to delay or prevent a termination of Federal trust responsibilities with respect to the land by the issuance of a fee patent or otherwise during the term of the lease; however, such termination shall not serve to abrogate the lease. The owners of the land and the lessee and his surety or sureties shall be notified by the Secretary of any such change in the status of the land.

10. IMPROVEMENTS.—Unless otherwise provided herein it is understood and agreed that any buildings or other improvements placed upon the said land by the lessee become the property of the lessor upon termination or expiration of this lease.

11. VIOLATIONS OF LEASE.—It is understood and agreed that violations of this lease shall be acted upon in accordance with the regulations in 25 CFR 131.

12. ASSENT NOT WAIVER OF FUTURE BREACH OF COVENANTS.—No assent, express or implied, to any breach of any of the lessee's covenants, shall be deemed to be a waiver of any succeeding breach of any covenants.

13. UPON WHOM BINDING.—It is understood and agreed that the covenants and agreements hereinbefore mentioned shall extend to and be binding upon the heirs, assigns, executors, and administrators of the parties to this lease. While the leased premises are in trust or restricted status, all the lessee's obligations under this lease, and the obligations of its sureties, are to the United States as well as to the owner of the land.

14. INTEREST OF MEMBER OF CONGRESS.—No Member of, or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract or to any benefit that may arise herefrom, but this provision shall not be construed to extend to this contract if made with a corporation or company for its general benefit.

15. APPROVAL.—It is understood and agreed that this lease shall be valid and binding only after approval by the secretary.

Form 5-5441
(PAO Revised
Oct 1971)



156

A50

a.d.a.