EXHIBIT "A" 

**OTHER**

As a material part of the consideration of this lease, Lessee hereby waives all claims against Lessors and/or the United States Government free and harmless from liability for all claims for any loss, damage, or injury arising from the use of the premises by Lessee, together with all costs and expenses in connection therewith.

**HOLDING OVER**

Holding over by the Lessee after the termination of this lease shall not constitute a renewal or extension thereof or give the Lessee any rights hereunder or in or to the leased premises.

**PROPERTY OF LESSOR:** Boundary Fences

**PROPERTY OF LESSEE:** Inside Fences, portable irrigation system.

Date: 10-4-94 Craig Oswalt

Craig Oswalt LESSEE

# FIRE DISTRICT NO. 5
# ASSESSMENT AGREEMENT

124 18590

**PROVISION NO.** 19

| | | | |
|---|---|---|---|
| **LESSEE:** Craig Oswalt | | **LEASE NO.** | **ALLOT. NO.** |
| **ADDRESS** 340 SR 223 | | 1-1-8705-9495 | 3704 & 3705 |
| Toppenish, WA 98948 | | **LEASE TERM** | **YEARS** (2) |
| **PHONE:** 854-1910 | | **FROM:** 1-1-94 | **TO:** 12-31-95 |

**LAND DESCRIPTION** 3704: SE¼SE¼; 3705: SW¼SE¼ (less all bldgs. and 1 acre, M/L., located in SW corner of NW¼SW¼SE¼); All in Sec. 1 T. 9 N., R. 21 E., W.M., WA., cont. 79.0 acres more or less.

**FIRE PROTECTION FEE $** 32.65

It is understood and agreed that the lessee will pay annually, on the date pecified for rental payment, the above fee for fire protection. This fee shall not exceed the levy charged for fire protection on comparable non-Indian lands in the vicinity.

Payment will be made to YAKIMA COUNTY FIRE DISTRICT NO. 5 and deposited with YAKIMA COUNTY FIRE DISTRICT No. 5, P.O. Box 447, Zillah, Washington 98953.

Yakima County Fire District No. 5 shall have the right to adjust the levy on leases exceeding six years, if necessary to conform with fees charged on similar land in the vicinity.

**DATE** 10-4-94 — Craig Oswalt (signature)
Craig Oswalt **(LESSEE)**

**DATE** ______

______ **(LESSEE)**

DATE: ______

67

124 18590

16. Prior to execution of this lease, provision(s) number(s) 17,18,19 has (have) been added hereto and by reference is (are) made a part hereof.

IN WITNESS WHEREOF, the lessee (and lessor has (have) hereunto affixed his (their) hand(s) and seal(s), the day and year first above written (and the lessor hereunto has caused to be attached his legal acceptance on which he has affixed his hand and seal).

Two witnesses to each signature:

Virginia LaPlante [signature]
Connie L. Adams [signature]

Craig Oswalt [signature]
Craig Oswalt LESSEE

LESSEE

LESSOR

Previous Rent: $3,000/yr. to Applicant, expired 12/31/93
FR: $3,290/yr. (7/93)
Offer: $3,000/yr. for a 2 year Farming & Grazing Lease to begin 1/1/94 within 10% of F.R.
Crit: 6(A) 2(B)
50% Estate
In accordance with 25 CFR 162.2(a)(3)

LESSOR

LESSOR

LESSOR

LESSOR

LESSOR

Approved 11/22, 1994 [signature] Approving Official
ACTING SUPERINTENDENT

RECEIVED OR FILED
BUREAU OF INDIAN AFFAIRS
PORTLAND AREA OFFICE
95 JAN 18 PM 12:08
BRANCH OF REALTY
TITLES & RECORDS
SECTION

Granted under the Act of July 8, 1940
(54 Stat. 745) for entire ownership.

124 18590

68

RECEIVED BY MAIL
MAY 5 1997
U.S. ATTORNEY
SPOKANE, WA

JAMES P. CONNELLY
United States Attorney
BRUCE E. DIDESCH
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| A. DEAN OSWALT and REINIE OSWALT, husband and wife; CRAIG OSWALT and MICHELLE OSWALT, husband and wife; and KIRK OSWALT and STACIE OSWALT, husband and wife,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | NO. CY-96-3133-LRS<br><br>UNITED STATES OF AMERICA'S REQUESTS FOR ADMISSIONS TO PLAINTIFFS |

TO: The above-named plaintiffs, and J. JAY CARROLL, your attorney:

Defendant, United States of America, herewith submits the following Requests for Admission to be answered separately and fully under oath within thirty (30) days from date of service of said Requests upon you.

IN ACCORDANCE WITH CIVIL RULE 36(a), EACH REQUEST FOR ADMISSION IS CONSIDERED ADMITTED UNLESS, WITHIN THIRTY (30) DAYS AFTER SERVICE OF THE REQUEST FOR ADMISSION, OR WITHIN SUCH SHORTER OR LONGER TIME AS THE COURT MAY ALLOW, THE PARTY TO WHOM THE REQUEST IS DIRECTED SERVES UPON THE PARTY REQUESTING THE ADMISSION A WRITTEN ANSWER OR OBJECTION ADDRESSED TO THE MATTER, SIGNED BY THE PARTY OR BY HIS ATTORNEY. IF OBJECTION IS MADE, THE REASONS THEREFOR SHALL BE STATED. THE ANSWER SHALL SPECIFICALLY DENY THE MATTER OR SET FORTH IN DETAIL THE REASONS WHY THE ANSWERING PARTY CANNOT TRUTHFULLY ADMIT OR DENY THE MATTER.

<u>REQUEST FOR ADMISSION NO. 1</u>: Admit that as to Allotment No. 794, Serial No. 1591(c), the Wapato Irrigation Project assessment for 1994 was not paid until June 23, 1994.

Admit

<u>REQUEST FOR ADMISSION NO. 2</u>: Admit that as to Allotment No. 299, Serial No. 1675, the Wapato Irrigation Project assessment for 1994 was not paid until June 23, 1994.

Admit

<u>REQUEST FOR ADMISSION NO. 3</u>: Admit that as to Allotment No. 300, Serial No. 1652, the Wapato Irrigation Project assessment for 1994 was not paid until June 23, 1994.

Admit

<u>REQUEST FOR ADMISSION NO. 4</u>: Admit that as to Allotment No. 1988, Serial No. 2081, the Wapato Irrigation Project assessment for 1994 was not paid until June 23, 1994.

Admit

<u>REQUEST FOR ADMISSION NO. 5</u>: Admit that as to Allotment No. T1131B, Serial No. 2440B, the Wapato Irrigation Project assessment for 1994 was not paid until June 23, 1994.

Admit

<u>REQUEST FOR ADMISSION NO. 6</u>: Admit that as to Allotment No. T2661, Serial No. 2108, the Wapato Irrigation Project assessment for 1994 was not paid until June 23, 1994.

Admit

<u>REQUEST FOR ADMISSION NO. 7</u>: Admit that as to Allotment No. 849, Serial No. 2027, the Wapato Irrigation Project assessment for 1994 was not paid until December 30, 1994.

Admit

<u>REQUEST FOR ADMISSION NO. 8</u>: Admit that as to Allotment No. 849, Serial No. 2027, the Wapato Irrigation Project assessment for 1994 was not paid until December 30, 1994.

Admit

<u>REQUEST FOR ADMISSION NO. 9</u>: Admit that as to Allotment No. T290, Serial No. 2756, the Wapato Irrigation Project assessment for 1994 was not paid until December 30, 1994.

Admit

<u>REQUEST FOR ADMISSION NO. 10</u>: Admit that as to Allotment No. T2482, Serial No. 1649, the Wapato Irrigation Project assessment for 1994 was not paid until December 30, 1994.

Admit

<u>REQUEST FOR ADMISSION NO. 11</u>: Admit that as to Allotment No. 596, Serial No. 3174, the Wapato Irrigation Project assessment for 1994 was not paid any time during 1994.

Admit. However, payment was eventually made.

REQUEST FOR ADMISSION NO. 12: Admit that as to Allotment No. 596, Serial No. 3174(cc), the Wapato Irrigation Project assessment for 1994 was not paid any time during 1994.

Admit. However, payment was eventually made.

REQUEST FOR ADMISSION NO. 13: Admit that as to Allotment No. T1011, Serial No. 2704, the Wapato Irrigation Project assessment for 1994 was not paid any time during 1994.

Admit. However, payment was eventually made.

REQUEST FOR ADMISSION NO. 14: Admit that as to Allotment No. 3704, Serial No. 3704, the Wapato Irrigation Project assessment for 1994 was not paid any time during 1994.

Admit. However, payment was eventually made.

REQUEST FOR ADMISSION NO. 15: Admit that as to Allotment No. 3705, Serial No. 3705, the Wapato Irrigation Project assessment for 1994 was not paid any time during 1994.

Admit. However, payment was eventually made.

REQUEST FOR ADMISSION NO. 16: Admit that as to Allotment No. 2303, Serial No. 2688, the Wapato Irrigation Project assessment for 1994 was not paid any time during 1994.

Admit. However, payment was eventually made.

DATED this 31st day of March, 1997.

JAMES P. CONNELLY
United States Attorney

BRUCE E. DIDESCH
Assistant U. S. Attorney

RESPONSES SUBMITTED this 2d day of MAY, 1997.

J. JAY CARROLL
Attorney for Plaintiffs

STATE OF WASHINGTON )
)ss.
County of Spokane )

_______________________________, being first duly sworn on oath, depose and say: I/we have read the responses set forth above, know the contents thereof, and believe the same to be true.

______________________
______________________
______________________
______________________
______________________
______________________

SUBSCRIBED AND SWORN TO before me this ______ day of ______________, 1997.

______________________
Notary Public in and for the State of Washington, residing at ______________.
Commission Expires: ________

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| A. DEAN OSWALT ET AL.,<br>Plaintiffs, | ) | |
| v. | ) | No. 97-733C<br>(Judge Futey) |
| UNITED STATES,<br>Defendant | ) | |

DEFENDANT'S PROPOSED FINDING OF UNCONTROVERTED FACT

1. Plaintiffs farm leased land in Yakima County, Washington, Comp. ¶ IV, which are within the Wapato Irrigation Project. Comp. ¶ VI. These lands are within the Yakima Indian Reservation, which was created by treaty in 1855. Comp. ¶ V.

2. In 1887, Congress enacted the General Allotment Act, which directed the Secretary of the Interior ("the Secretary") to allot lands within the Reservation to individual indians. 24 Stat 388 (1887). In addition, the General Allotment Act, authorized the Secretary to hold the allotted lands in trust for a period of 25 years. Id. Finally, the General Allotment directed the Secretary to promulgate rules and regulations to govern the "just and equitable distribution" of irrigation water to the extent that irrigation water was necessary to render the land "available for agricultural purposes." 24 Stat. 390.

3. The Reclamation Act of 1902 further authorized the Secretary to construct irrigation projects to provide water for agricultural purposes. 43 U.S.C. § 317 et seq. The Reclamation Act created "a massive program to construct and operate dams, reservoirs, and canals for the reclamation of arid lands in 17 western states." Arizona v. California, 438 U.S. 645, 650 (1978).

4. The Wapato Irrigation Project was created pursuant to the Reclamation Act of 1902. Comp. ¶ VI.

5. Also, in 1902, Congress enacted legislation to allow the Indians or their heirs to sell and convey land they obtained as a result of the General Allotment Act. 32 Stat 275 (1902). Shortly thereafter, in 1904, Congress authorized the Secretary to dispose of any unallotted lands within the Yakima Indian Reservation. 33 Stat 595-96. In addition, the legislation directed the Secretary to apply the proceeds of sales of unallotted land to, among other things, "the construction, completion, and maintenance of irrigation ditches." 33 Stat. 597. The legislation further authorized the Secretary of the Interior to "require annual proportionate payments to be made as may be just and equitable for the maintenance of [irrigation] systems." 33 Stat. 598.

6. In 1916, Congress enacted further legislation authorizing the construction of a dam to increase the water supply on the Yakima Reservation. 39 Stat. 154. The 1916 legislation expressly authorized the Secretary to "fix operation and maintenance charges" and to promulgate rules and regulations governing the distribution of water. 39 Stat. 154.

7. In addition, the legislation made compliance with all the regulations of the Secretary a condition precedent to receiving water. 39 Stat. 154.

8. The leased lands which plaintiffs farm fall into both categories: fee lands which were conveyed to private individuals who subsequently leased them to plaintiffs, and trust lands, which the Secretary holds in trust for the Yakima Nation. Comp. ¶ XV, Domondon Affidavit, ¶ 3, App. at 5-6.[1] Both the fee lands and the trust lands are within the boundaries of the Wapato Irrigation Project, Comp. ¶ XV, which is administered by the Bureau of Indian Affairs ("the

---

[1] "App." refers to the 302 page appendix that is being filed with the Government's Motion To Dismiss, Or In The Alternative, For Summary Judgment. The documents in the appendix were part of the record created during the district court litigation.

Bureau"). 25 C.F.R. § 171.

9. With regard to the fee lands, plaintiffs' allege that their right to receive water is set forth and governed by the "Application for Water Rights" associated with the fee lands. Comp. ¶ XVI.

10. With regard to the leased lands, the plaintiffs' right to receive water is governed by the lease they entered with the Secretary. Comp. ¶ XVII.

11. Both the Application for Water Rights and the Leases require plaintiffs to pay operation and maintenance fees as a condition precedent to receiving water. Domondon Affidavit ¶3, App. at 5, Applications ¶¶ 7,8, 10, App. at 11, 14, 17, 20-21, 25, 28.

12. The Application For Water Right expressly incorporates the Act of May 18, 1916, which provides in pertinent part:

> The cost of the entire diversion works and distribution and drainage system shall be reimbursed to the United States by the owners of the lands irrigable thereunder not to exceed twenty annual installments

Application for Water Right, ¶ 2; citing 39 Stat. 154, App. at 10, 13, 16, 19, 24, 27. In addition, the Application further provides that all lands are subject "annual operation and maintenance of the Wapato Unit of the Yakima Irrigation Project" payable "under such rules and regulations as the Secretary of the Interior may prescribe." Application, ¶ 7, App. at 11, 14, 17, 20-21, 25, 28. The Application also requires payment for "all of the charges for water specified herein, whenever the same shall become due and payable, under such regulations as the Secretary of the Interior may from time to time prescribe. Application, ¶ 8, App. at 11, 14, 17, 20-21, 25, 28. Finally, the Application expressly authorizes the Secretary to refuse delivery of water in the

event that the operation and maintenance assessments are not paid. Application, ¶ 10, App. at 11, 14, 17, 20-21, 25, 28.

13. The leases likewise require the payment of operation and maintenance charges as a condition precedent to receiving irrigation water. The leases expressly state that:

> It is understood and agreed that the lessee will pay all operation and maintenance assessments annually in advance on the due date preceding each irrigation season, including any penalties accruing against the above described land under irrigation, and will pay all charges assessed in connection with any other improvement project or district within which the lands may be located pursuant to the existing or future orders or regulations of the Secretary.

Lease, ¶ 3, App. at 32, 40, 45, 54, 62, 71, 80, 87, 91, 98, 105, 113, 120, 126, 135. The lease also incorporates 25 C.F.R. part 162. Leases, App. 31,39, 44, 53, 61, 70, 79, 86, 90, 97, 104, 112, 119, 125, 134. Significantly, 25 C.F.R. § 162.13(a) expressly requires all lessees to pay all charges assessed against the land on or before the due date.

14. In addition to the contractual language requiring plaintiffs to pay their operation and maintenance assessments in advance, the regulations promulgated by the Secretary also expressly require that these charges be paid before any irrigation water is distributed.

15. Indeed, 25 C.F.R. § 171.17(a) expressly prohibits the delivery of irrigation water to land users who have not paid their operation and maintenance assessments. ("Irrigation water will not be delivered until the annual operation and maintenance assessments are paid in accordance with the established annual rate schedule."); see also 25 C.F.R. §§ 171.17(b); (c).

16. Finally, the regulations governing the Operation and Maintenance Assessments provide an administrative process for resolving complaints. 25 C.F.R. § 171.22 requires that water users make all complaints in writing to the Project Engineer or Officer in Charge of the Project. In

addition, the regulations allow the water user to seek further review of any dispute regarding the application of the regulations by appealing first to the Area Director, and to the Commissioner of Indian Affairs. 25 C.F.R. § 171.23.

17. Despite their contractual and regulatory obligations, plaintiffs did not pay their O&M assessments in advance of the irrigation season. Domondon Affidavit ¶ 3 and attachment 1, App. at 5, 8, Requests for Admission Nos. 1-16, App. 1-3.

18. Dean Oswalt did not pay the O&M assessments for Allotment Numbers 849, 2482, and 290 until December 30, 1994, and did not pay O&M assessment for Allotment Number 596 at any time during 1994. Domondon Affidavit ¶ 3 and attachment 1, App. at 5,8; Requests for Admission Nos. 7-12, App. at 2-3; Oswalt Affidavit ¶ 3, App. at 298. In addition, Dean Oswalt did not pay the O&M assessments for Allotments Numbers 794, 299, 300, 1988, T1131, and T2661, until June 23, 1994. Domondon Affidavit ¶ 3 and attachment 1, App. at 5,8; Requests for Admission Nos. 1-6, App. at 1-2; Oswalt Affidavit ¶ 3, App. at 298.

19. Craig Oswalt did not pay the O&M assessments for Allotment Numbers T-1101, 2303, 3704, 3705 at any time during 1994. Domondon Affidavit ¶ 3 and attachment 1, App. at 5,8; Requests for Admission Nos. 13-16, App. at 2-3, Oswalt Affidavit ¶ 3, App. at 298.

20. Kirk Oswalt did not pay the assessments for Allotment 849 until December 30, 1994. Domondon Affidavit ¶ 3 and attachment 1, App. at 5,8; Requests for Admission Nos.7-8, App. at 2, Oswalt Affidavit ¶ 3, App. at 298.

21. During 1994, the Yakima Indian Reservation experienced one of the worst droughts on record. Oberly Affidavit, ¶ 2; App. at 176; Howerton Affidavit, ¶ 6, App. at 255. Consequently, there was a water shortage and the amount of available water was drastically reduced. Oberly

Affidavit ¶¶ 2,3,6, App. at 176-77; Cartmell Affidavit, ¶ 3, App. at 200; Schramm Affidavit, ¶ 13, App. at 217-18.

22. It was therefore very difficult for the Secretary, acting through the Bureau of Indian Affairs, to deliver sufficient irrigation water. Oberly Affidavit, ¶¶ 2,8-9 App. at 176, 178; Cartmell Affidavit, ¶¶ 3,5-7, App. at 200-02.

23. The Secretary made extensive efforts to equitably distribute the reduced amount of water. Oberly Affidavit, ¶¶ 4-10; App. at 177-79; Cartmell Affidavit, ¶¶ 3-6, App. at 200-02. Despite these significant efforts, as a result of the drought, there was insufficient water available to meet the demands of water users. Oberly Affidavit ¶¶ 2, 8,9, App. at 176, 178; Cartmell Affidavit ¶ 6, App. at 201; Howerton Affidavit, ¶ 6, App. at 255.

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

DAVID M. COHEN
Director

Sharon Y. Eubanks
SHARON Y. EUBANKS
Deputy Director

Janene Marasciullo
JANENE M. MARASCIULLO
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street
Washington, D.C. 20530
(202) 307-0290
Attorneys for Defendant

August 31, 1998

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 31st day of August 1998, I caused to be placed in the United States mail (first class mail, postage prepaid) copies of "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" addressed as follows:

J. Jay Caroll
Velikanje, Moore & Shore, Inc., P.C.
405 East Lincoln Avenue
PO Box C2550
Yakima, Washington 98907

[signature]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| A. DEAN OSWALT and REINIE OSWALT, husband and wife; CRAIG OSWALT and MICHELLE OSWALT, husband and wife; and KIRK OSWALT and STACIE OSWALT, husband and wife;<br><br>vs.<br><br>United States of America. | NO. 97-733 C<br>(JUDGE FUTEY) |

**Plaintiffs' Statement of Genuine Issues**

1. Plaintiffs agree with paragraph 1 with the addition that Dean Oswalt also farms lands which he owns in fee. (Sworn Statement of A. Dean Oswalt at ¶1)

2. Plaintiffs agree with paragraph 2.

3. Plaintiffs agree with paragraph 3.

4. Plaintiffs generally agree with paragraph 4 but the exact creation is described in ¶9 of Plaintiffs' Proposed Finding of Uncontroverted Fact.

5. Plaintiffs agree with paragraph 5.

6. Plaintiffs agree with paragraph 6.

7. Plaintiffs disagree that a "condition precedent" is set forth in the statute.

8. Plaintiffs agree with paragraph 8.

9. Plaintiffs agree with paragraph 9.



Velikanje, Moore & Shore, P.S.
attorneys at law
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907
(509) 248-6030

10. Plaintiffs agree with paragraph 10.

11. Plaintiffs generally disagree with paragraph 11. Both the Application for Water Rights and the Leases contain paragraphs addressing the payment of assessments but do not make the payment thereof a "condition precedent to receiving water." The "Application for Water Right" at ¶10 provides:

> The party of the first part hereby reserves the right to refuse delivery of water at any time to any tract of land described herein upon failure of the owners to promptly pay any irrigation charges occruing against said land when such charges become due and payable as announced from time to time by the Secretary of the Interior.

The lease agreements provide, at ¶3 that:

> It is understood and agreed that the lessee will pay all operation and maintenance assessments annually in advance on the due date preceding each irrigation season, including any penalities accruing against the above described land under irrigation and will pay all charges assessed in connection with any other inmprovement project or district within which the lands may be located, pursuant to the existing or future orders or regulations of the Secretary.

12. Plaintiffs agree that the "Application For Water Rights" quotes the Act of May 18, 1916 (39 Stats. 154) and that the defendant has acurately quoted that section. Paragraph 7 of the Application for Water Rights provides, in pertinent part that, "It is the sense of this agreement that the lands in the respective Classes A and B shall be subject to the following pro rata irrigation charges, on a per acre basis, payable under such rules and regulations as the Secretary of the Interior may prescribe: . . ."



Velikanje, Moore & Shore, P.S.
attorneys at law
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907
(509) 248-6030

Paragraph 8 of the Application for Water Rights provides that:

> The party of the second part hereby binds himself, his heirs, and assigns to pay all of the charge for water specified herein, whenever the same shall become due and payable, under such rules and regulations as the Secretary of Interior may from time to time prescribe, which charges, and each installment thereof , until paid, shall constitute a first lien against the land described herein; and which said lien may be enforced in the same manner and to the same extent as mortgages against land are enforceable under the statutes of the State of Washington.

13. Plaintiffs agree with paragraph 13.

14. Plaintiffs agree that the lease language states that operation and maintenance assesements will be paid in advance. See response to paragraph 15 below for the discussion of the regulations refered to in paragraph 14.

15. Plaintiffs agree that the defendant has accurately quoted a portion of 25 C.F.R. § 171.17(a). The other section of 25 C.F.R. § 171.17 are not set forth. 25 C.F.R. § 171.17(c) & (e) do not provide that assessments must be paid prior to the delivery of water.

16. Plaintiffs agree that 25 C.F.R. § 171.22 provides that, "All complaints must be made in writing to the Project Engineer or the Officer-in Charge of the project." Plaintiffs further agree that 25 C.F.R. § 171.23 provides that:

> In case of a dispute between a water user and the Project Engineer or Officer-in-Charge of the project concerning the application of the regulations of this part or a decision rendered by such official, the water user within 30 days may appeal to the Area Director. Further appeals may be made to the



Velikanje, Moore & Shore, P.S.
attorneys at law
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907
(509) 248-6030

Commissioner of Indian Affairs pursuant to part 2 of this chapter.

17. Plaintiffs agree that some payments were not made prior to the irrigation season begining. The citations to the record by defendant identifies when the payments were made. In addition, the Declaration of A. Dean Oswalt, at ¶7 states this as well and states that all payments for 1994 have now been made.

18. Plaintiffs agree with paragraph 18.

19. Plaintiffs agree with paragraph 19.

20. Plaintiffs agree with paragraph 20.

21. Plaintiffs agree with paragraph 21.

22. Plaintiffs agree that the drought of 1994 presented the WIP with a challenge to deliver irrigation water throughout the project. Plaintiffs disagree that it was difficult to accomplish this task since, as is set forth in the Sworn Statement of A. Dean Oswalt at ¶¶ 6-10, they did receive their proportionate share of irrigation water from the inception of the irrigation season through June 9, 1994 and again beginning on July 24, 1994 through the end of the irrigation season.

23. Plaintiffs disagree with ¶ 23. As is set forth in the Oswalt Sworn Statement at ¶¶ 6-10, the plaintiffs had no problem receiving their proportionate share of irrigation water for the entire irrigation season with the exception of the time between June 9, 1994 and July 24, 1994. During that time, the plaintiffs' neighbors, who drew water from the same canals as plaintiffs, were receiving their proportionate share of irrigation water.



Velikanje, Moore & Shore, P.S.
attorneys at law
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907
(509) 248-6030

Sufficient water was available to give the plaintiffs their proportionate share. It simply was not delivered.

DATED this 30TH day of September, 1998.

VELIKANJE, MOORE & SHORE, P.S.
Attorneys for Plaintiffs

By: [signature]
J. Jay Carroll
WSBA No. 17424





Velikanje, Moore & Shore, P.S.
attorneys at law
405 East Lincoln Ave.
P.O. Box 22550
Yakima, WA 98907
(509) 248-6030

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

A. DEAN OSWALT and REINIE OSWALT, husband and wife; CRAIG OSWALT and MICHELLE OSWALT, husband and wife; and KIRK OSWALT and STACIE OSWALT, husband and wife, )

Plaintiffs, )

vs. )

UNITED STATES OF AMERICA, )

Defendant. )

NO. 97-733 C

ORIGINAL

DEPOSITION OF A. DEAN OSWALT

Taken at the instance of the Defendant

April 24, 2007

10 o'clock a.m.

402 East Yakima

Yakima, Washington

BRIDGES & ASSOCIATES
Certified Shorthand Reporters
P. O. Box 5999
Kennewick, Washington 99336
(509) 735-2400 - (800) 358-2345

Q. Mr. Oberly.
A. Mr. Oberly invited us to come to his office as a result of the meeting we had with him on his lateral. He says, "Come to my office and we'll provide you with the tort claims." And he said, "This is our means of satisfying when we cannot provide water."
Q. Okay. And you filed a tort claim ultimately?
A. We did so, due to his suggestion.
Q. Okay. And the information that you filed in connection with that tort claim is accurate, correct?
A. As much so as we had. We farmed it, we took the crop to the end, we reaped it, and we established the yields of that. And you see those averages before you.
Q. So where you talk about an average yield in those documents, those are the correct average yields for your allotments?
A. '94, yes.
Q. Okay. All right. Now, to receive an average yield -- strike that.
If you get 100 percent of the water that you could get under your water rights from the Wapato Irrigation Project, that would be enough to produce an average yield?
A. Yes.
Q. Okay. What if you got 50 percent of the water that you could get under your allotment? What kind of yield

would that produce?

A. Stressed. It would affect it drastically. It depends on -- your big element would be heat units. How hot is it. Are we getting 110 degrees in July. Big factor. If it stays cool in July, less need for water.

Q. Okay. If you had gotten 50 percent of the water that you were supposed to receive under your allotment under the conditions in effect in 1994, what would that do to your average yield? As a percentage of your average yield, what yield would you get?

A. Honestly, I can't give a percentage because I -- 50 percent water, though, would drastically affect average yields.

Q. Can you give me a ball park guess?

A. If we're talking 5 and a half, 6 ton -- I think we used 5 and a half ton corn. Generally we're 6 ton to the acre on dry corn. I would say somewhere around 3.

Q. So 50 percent of the water would give you 50 percent of the yield?

A. Yeah. And that's -- you double your moves on water trying to get it to cross. It just doubles and triples the workload trying to distribute the water, what little you might have, as we had to do then. We was on eight hour sets on some of that trying to --

Q. Okay. What if you got 40 percent of the water

that you could get under your water rights? What would that do to your yield? Can you provide a guess?
A. Again, we're grabbing straws here. I don't know. It would be significant to average yields is all I can say.
Q. It would be less than a 50 percent yield?
A. Oh, absolutely, if you got 40 percent water.
Q. And if you got 30 percent of the amount of water that you're supposed to get under your allotment, that would be less than a 50 percent yield?
A. Yes.
Q. Significantly less than a 50 percent yield?
A. Probably so.
Q. Less than a 40 percent yield?
A. I would say so.
Q. Less than a 30 percent yield?
A. You mentioned 30 percent. So --
Q. Well, if you only got 30 percent of the water, would your yield then be 30 percent of an average yield?
A. You can't say. There are too many elements that you have to consider in nature. I mean, the heat is the big factor.
Q. Okay. But we're talking about in the conditions that were in existence in 1994. Same heat, same conditions, weather.
A. I can't give you a figure. Honestly, I don't

know. We had significant yield losses due to the water that was available. And a lot of that water was through efforts of pumping and such.

Q. Okay. But we have said that a 50 percent -- 50 percent water would yield about 50 percent under the conditions in '94. That's your ball park estimate?

A. If you had 90 degree days, sir, that's probably true. If you got 105 degree days, it would be drastically less.

Q. Okay. Were the conditions in 1994 90 degrees days or 105 degree days?

A. It was warm, very warm.

Q. Over 90 degrees?

A. Yes.

Q. Over 100?

A. We had a period of a week or so of over 100 degrees, I believe it was. I can't be specific because I didn't look into the weather element, but we did go through some very hot times.

Q. Okay. This would be the same across -- what we're saying now would apply generally to all the parcels of land that are at issue in this litigation?

A. Yes.

Q. Same conditions affected them?

A. Yes.

Q. And we had started talking about grain corn. Is the same true about silage corn generally?
A. Everything would show up. Heavy effects due to water source.
Q. Same amount of water?
A. Yeah. Very, very --
Q. So if we're talking about silage corn, if you get 50 percent of the water under the conditions in existence in 1994, you'll get 50 percent or less of the yield?
A. Well, again, we're grabbing straws. I would say you're going to get significant yield losses. What that might be, I don't know.
Q. You've given me some answers. And I just want to make sure that I'm understanding you correctly because you did testify a moment ago that 50 percent under the conditions in '94 would give you a 50 percent yield or less. You did say that. That was your guess as an experienced farmer.
A. That would be a guess.
Q. Okay. And you also said that a 40 percent amount of water from the irrigation system would yield to a 40 percent or less?
A. Again, I say we're grabbing straws because we don't live those type situations often. In normal situations -- we've had water stress years even since, but not to that point of '94.

Q. Okay.
A. So it's hard to put figures down in percentage and such because there's too many elements to deal with.
Q. Okay.
A. Act of God, weather. It's just too many things. If you get periodic rains in June and July -- normally you get into cherry season in the valley -- those would substantiate and help and linger the need for more water. But sometimes it happens. Sometimes it don't. You can't depend on it.
MR. CARROLL: It's always going to rain during cherry season.
THE WITNESS: Alfalfa season, first of June, cherry season, it generally rains. And sometimes pretty significant. And that could prolong a need for water in the corn fields. But to depend on it -- again, act of God.
Q. (By Mr. Edmunds) I want to talk about the allotments a little bit. I think we've already said that you're familiar with all the parcels?
A. Well, recollection. We're probably still farming most of them.
Q. Okay. I'm going to go through each one, actually. Let's talk about lot -- if you don't remember, that's a perfectly fine answer, but let's talk about Lot 794 first.
A. That is the homeplace. That's where we live.

Q. So that's probably the one you remember the most?
A. Yes.
Q. Lot 794 you said was planted to silage corn?
A. Yes.
Q. Do you know how many acres that was?
A. We've been planting more grapes on homeplace. I think at the time it was near 50 acres, 45. I don't know what --
Q. Okay. But it will say that in your papers and you'll agree that all of that is correct?
A. Yes.
Q. Okay.
A. I might add that that is also where the greatest need is for water. It's a high distribution point. And that's where the drain goes through and we had the three and four pumps set up, but that's on the homeplace, home property, on the big Marion Drain.
After the check in the highway here, my place is just below it. So it's water that runs to the river they tell us we can use if pumped back. And that's where the pumps were is right here. My property is right here. (Indicating.)
Q. So all four of those pumps were on --
A. There was three of them there, sir, and then there was one over on to drain water to my son's property, mint

field.

Q. Okay. And that's not at issue in this litigation anymore?

A. It was, but then it's been eliminated, the mint.

Q. Okay. So the three of the four pumps were allotted to allotment 794 and not the other allotments?

A. We was exchanging pumps. The neighbor allowed us two weeks of his pump. We had it while he was on vacation. And then we got this pump and then we had a pump from the dairy. So we was exchanging pumps. We got a little power takeoff pump we had in there trying to supplement, trying to make a crop.

Q. How many pumps did you have running at once?

A. Three.

Q. And this includes all of the pumps that you got from anybody?

A. Well, we was exchanging again. We had three at this site and we had another over here on the drain spur that we was supplying fuel to all of them.

Q. Okay. For all of your allotments, at any one given time how many pumps did you have running?

A. Okay. At that time I would say probably -- I'm talking my sons' pumps, too, but then some of that was excluded. I would say four to five pumps running.

Q. Okay. For all the allotments that you and your

sons operated, four to five pumps?
A. Yes.
Q. Okay.
A. In that we had -- again, with Mr. Cartmell's assistance we had their pumps set up on a pond, a fishing pond nearby pumping in the delivery ditch. That was fine until the pond run dry and the pump had to be lifted. Supplemental. That was clear back in June, early June, that they pulled water out of this fish pond on Highway 223.
Q. Okay. But going back, four or five pumps, and that was between June 10 and July 24 of '94?
A. Yes.
Q. And that's how many pumps would be running at once regardless of where you got them?
A. It was periodic. Three and four I would say.
Q. Three and four?
A. Yeah, because -- I mean, we were exchanging pumps. I mean, we was calling all over trying to find somebody that had an idle pump. Like I said, we pulled out of the dairy, his lagoon, pond. They was graceful enough to let us use their pump. And it helped a little bit.
Q. Okay. And you said three or four were also -- how many were running on Lot 794 of these pumps?
A. Three at one time on that allotment.
Q. Okay. For the whole time period?

A. Yeah. But you got to understand, 794 -- at this strategic spot we had other acres under 794. So these pumps were not pumping on 794 only. There was other acreage below. We was pumping into the lateral, which supplied other acres below.

Q. Okay. But you would agree with me that there was some of your allotments during this period that had no pumps whatsoever pumping water into it?

A. Oh, because there was no means of pumping. I mean, there was no drains, there was no ponds, there was no means of water other than through the Wapato Irrigation system.

Q. Okay.

A. Yes.

Q. All right. I'm going to ask you about each of these allotments then starting with 794. Do you recall --

MR. CARROLL: Brian, before we get into that, can we go off the record for a second?

MR. EDMUNDS: Sure.

(Discussion off the record.)

(Recess from 11:12 to 11:18.)

EXAMINATION (Continuing)

BY MR. EDMUNDS:

Q. So 794 was planted to silage corn. Do you know as

a percentage of the average yield what the yield was for Lot 794 in 1994?

A. All we know is the actual. In percentage, I don't know. Normally we're 29, 30 tons to the acre. Average this year was significantly less. With help from the pumps and such -- the natural flow system is very nil of water in that area. But we was able to get the 22 ton I think it was. 21, 22 ton. It was still not a good crop. Far from meeting expenses.

Q. 22 out of -- what's the average?

A. Somewhere around 30. 29, 30. And I think the price at that time was $25 a ton to the dairy delivered price. Chopped, delivered.

Q. And can you give me a ball park figure of how much of the percentage of water you were supposed to receive from the irrigation project you received from either the gravity flow system or the pumps?

A. Can I say something?

Q. Sure.

A. I don't want to be out of line. Because of the loss, we submitted an application to our on ASCS office, government agency, as a claim for the poor yield. And quite often you get assistance to help you bring it back up to the average.

Q. I'm going to ask you about that eventually, but --

A. Okay. You want me to shut up then?
Q. No, no. That's fine.
A. Okay. But we submitted our application for the grain corn at the 2 point whatever it was. They submitted it back to us and said they denied our claim. Said that 70 percent was the percentage that they arrived at for the valley, 70 percent water to all. They said had you not received your 70 percent -- and I have a statement already saying this -- it was by reason of Wapato Irrigation that you didn't receive such.
We felt lower than the table. We thought we was going to get some help. So it just blew us away.
Q. But can you give me an estimate of how much of the average water that you would receive in an average year -- or how much water you were entitled to that you actually received on Lot 794 in 1994?
A. Very little, if any. Most of it I indicated was by those pumps.
Q. And how much -- what percentage water did you receive -- what percentage of the average water that you would get through the gravity flow system did you receive through those pumps?
A. It's hard to meter those pumps because they were all a different -- one was an 8 inch. One was a -- the biggest one was a 3,000 gallon. The smallest one was 700,

800 gallon. The third one, I don't know what it was. But like I indicated, they were distributing water into the lateral which was feeding other acres below.

So percent, I can't give you a percentage. I don't know what that --

Q. You don't have a ball park estimate for me based on many years of farming experience?

A. 50 to 70 percent water we can make a crop out of it. We just have to -- we have to speed up our intervals of changing the water so we can hurry across fields. And as soon as the water is done, when the drain ends, why then we move it and change it. But that's if you had the 50 to 70 percent.

Q. How much ball park estimate do you think you got from the pumps?

A. Far less because it was distributed amongst several allotments.

Q. Okay. Far less. Less than 50 percent?

A. Yes. I'm not going to give you a figure. I have no idea.

Q. More than 20 percent?

A. Maybe so. I don't know.

Q. More than 25 percent?

A. I'm not going to give you figures because I don't honestly know the actual output of the pumps.

Q. Okay. But it could be more than 20 percent?
A. Possibly.
Q. Okay. Let's go to Lot 361. First of all, whose allotment -- who, I guess, receives the profits from allotment 361?
A. On that year it was ours, or mine.
Q. Yours. Okay.
A. And that was fed off the west lateral that we alluded to here earlier.
Q. Okay. And what is the average yield of that allotment?
A. That's a very good piece of ground. I mean, if it's in silage we're talking, maybe 35 ton to the acre, 40.
Q. Okay. How much did you actually get in 1994?
A. I can't tell you. I've got the figures there. I didn't go over the figures. We averaged it out, and I think 22 ton was the average. That may have been grain corn.
MR. CARROLL: It was grain corn.
THE WITNESS: It was grain corn. Yeah.
Q. (By Mr. Edmunds) Okay. 22 is the average across all of the allotments?
A. Yes, it was.
MR. CARROLL: But that's for silage corn, right?
THE WITNESS: Silage, yes.

Q. (By Mr. Edmunds) Okay. For grain corn what is the figure?

A. Average?

Q. Yes.

A. 2 point whatever it was, 5, 4. Whatever it is. You've got it before you.

Q. I'm just asking if you can remember.

A. No. We average generally -- we harvest -- back in those days we harvested our own with a combine, and normally we're in the 5.8 to 6 ton dry corn per acre. I think we used a lesser figure there, 5 and a half ton.

Q. Would you say that on allotment 361 you turned out a good yield of grain corn?

A. It's a very good piece of ground absent of gravel. We're in a gravel area there. So this field is very deep soil and such. And I would guess probably maybe 4, 3 and a half, 4 ton. It brought the average up. Some of the fields I doubt were a ton to the acre.

Q. Okay. And can you give me an estimate on how much of the percentage of water you were entitled to you got on Lot 361?

A. I don't even recall because we were in such frustration. I mean, we had it one day and not the next. I mean, it was hard to measure anything because of the lateral and the fluctuation of being on the high level, as I

indicated earlier. Some days you'd go there and you had an empty ditch. Most always.

Q. But a good turn out?

A. We didn't have a good turn out that year on water.

Q. On 361, though, you had a good yield. You said it brought the average up.

A. Because of its nature of ground and such it, I believe, was somewhere around the 3 and a half ton area. But it brought the average up on some of the fields that made a ton to the acre.

Q. Did you provide any pumps on allotment 361?

A. There was no means of pumping from anywhere. No means. No drains. No anything. No. It was natural flow only.

Q. Okay. How about allotment 363? That's in a similar location, correct?

A. That's just a small 6-acre corner. It's right here. (Indicating.)

Q. Similar soil type as 361?

A. Very, very, very good deep soil.

Q. Would have brought the average up?

A. Well, yeah.

Q. The average yield up?

A. It would have helped.

Q. Okay. And would have received about the same

amount of water as 361?

A. Absolutely. It's all the same system.

Q. And so the yield would have been higher than the average across all of your allotments?

A. It would have been the highest. It's the best piece of ground I've got.

Q. And no pumps?

A. No. Absolutely no means of pumping from drains or ponds or anything. The source of water is up here off the Marion Drain that supplies the west and the east laterals.

Q. Okay. How about lot 3694?

A. 3694 is off the other system I indicated, and it's clear down here on the Satus. Very minimal on the end of that ditch as well. Very minimal water.

Q. Okay. How is the yield?

A. I honestly don't remember the yield on that. We combined the yields to give you an average.

Q. Okay. And you said that 3694 didn't get a lot of water?

A. Very minimal. It's off of pump 2.

Q. Can you give me an estimate of the yield, the approximate yield as a percentage of the average?

A. 3694?

Q. Yes.

A. May have been 2.8. Something like that.

Q. What would that be as a percentage of the average?
A. Well, your average, I believe, you've got at 2.2.
Q. 2.2?
A. I don't know. You've got the figures before you.
Q. I have them right here.
A. Or 2.6. I don't really recall.
Q. This was the stuff you gave me today.
A. It wasn't good. 3694 again -- okay. 2.8 I think it shows here.
Q. Okay. And the average yield would have been 5.5. Am I reading this correctly?
A. Had we 70 percent-plus water, yes.
MR. EDMUNDS: Well, let me note for the record this is a document that I was presented with this morning, and we've agreed that should I have further questions regarding this document, I will be able to ask them by telephone continuation of this deposition. And can counsel agree with me to that on the record?
MR. CARROLL: I can.
MR. EDMUNDS: All right. Thank you.
Q. (By Mr. Edmunds) Going back to the questions and back to Lot 3694, out of the average 5.5 tons to the acre, how much would you say that lot got? And you may have said it already, but since I didn't have this paper right in front of me, I need to ask it again.

A. With the water received, it may have been very close to the average, the 2.8.
Q. Okay.
A. There is no gravel in that area, but it is sandy. But yet, it's on the end of the lateral. And it was a very, very tight situation. The neighbors were -- one day you have it, the next day you don't. Very little.
Q. Did you use pumps on that lot?
A. No means to pump. There's no open drains. There's nothing there. That would be natural for the system.
Q. Okay. Lot 1988.
A. Yes.
Q. Who operates that one?
A. We do. I do.
Q. And grain corn again?
A. Yes.
Q. And how much water, approximately, did you receive on that allotment?
A. That's in the flow off of the three pumps that we indicated earlier, an extension of that lateral.
Q. So you did receive water on that?
A. Through the pump system, them three pumps. But very little.
Q. Okay. And what would you say the yield was on that?