# EXHIBIT E

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

A. DEAN OSWALT and REINIE OSWALT, husband and wife; CRAIG OSWALT and MICHELLE OSWALT, husband and wife; and KIRK OSWALT and STACIE OSWALT, husband and wife,

Plaintiffs,

vs.

UNITED STATES OF AMERICA,

Defendant.

NO. 97-733 C

DEPOSITION OF A. DEAN OSWALT
Taken at the instance of the Defendant

April 24, 2007
10 o'clock a.m.
402 East Yakima
Yakima, Washington

BRIDGES & ASSOCIATES
Certified Shorthand Reporters
P. O. Box 5999
Kennewick, Washington 99336
(509) 735-2400 - (800) 358-2345



BE IT REMEMBERED that the deposition of A. DEAN OSWALT was taken on behalf of the Defendant before Toni R. Bailey, Certified Court Reporter for Washington, on Tuesday, the 24th day of April, 2007, at 402 East Yakima Avenue, Suite 210, Yakima, Washington, commencing at the hour of 10 o'clock a.m.

* * *

APPEARANCES

For the Plaintiffs: J. Jay Carroll
Velikanje Moore & Shore
405 East Lincoln Avenue
Yakima, Washington 98907
509.248.6030
509.453.6880 (fax)

For the Defendant: Brian T. Edmunds
U.S. Department of Justice
1100 L Street NW
Washington, DC 20530
202.616.8253
202.307.0972 (fax)
Mary Anne Kenworthy
U.S. Department of the Interior
500 NE Multnomah, Suite 607
Portland, Oregon 97232
503.231.2121
503.231.2166 (fax)

* * *



I N D E X

Oswalt v. United States of America
Case No. 97-733 C
April 24, 2007

T E S T I M O N Y


| A. DEAN OSWALT | PAGE NO. |
|---|---|
| Examination by Mr. Edmunds: | 4 |


P R O D U C T I O N R E Q U E S T S

(None)

E X H I B I T S


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1 | 2-page Affidavit of Craig Oswalt | 15 |
| 2 | 7-page Notice of Appeal | 17 |
| 3 | 2-page map | 22 |
| 4 | 1-page map | 30 |
| 5 | 9-page Farming and Grazing Lease | 64 |
| 6 | 2-page First and Second Notice of Delinquency | 66 |
| 7 | 5-page Promissory Note | 73 |




(A. DEAN OSWALT, called as a witness by the Defendant, being first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:)

EXAMINATION

BY MR. EDMUNDS:

Q. Mr. Oswalt, we just met off the record, but I will introduce myself again on the record. I'm Brian Edmunds. I'm from the commercial litigation branch of the Department of Justice in Washington, and I represent the United States in this with Ms. Mary Anne Kenworthy from the Department of the Interior. And I'll be taking this deposition.

Before we begin, I'll just go through a couple of ground rules. Have you been deposed before, sir?

A. No.

Q. Okay. As you see, we have a court reporter here.

A. Yes.

Q. And she takes down everything that we say. And it's very difficult for her if we talk at the same time. So we try to avoid doing that. It doesn't always work that way, but we try to talk one at a time. So if I'm speaking, if you'll refrain from it, and I'll try to do the same for you so that the court reporter can get everything down.

The other thing is, if I ask a question and you don't understand the question, please let me know and I will try to repeat the question and clarify it for you.
A. Okay.
Q. Is there any reason -- have you had any substances or do you have any condition that would interfere with your ability to give correct and truthful answers today in this deposition?
A. None to my knowledge other than a little bit of forgetfulness from time to time. A lot of water under the bridge since these days.
Q. Right. Can you tell me where you were born, Mr. Oswalt?
A. Yakima.
Q. Yakima. And what year was that?
A. 42.
Q. 42. And have you lived here all your life?
A. Absolutely.
Q. Okay. What is your educational background?
A. Twelve years high school.
Q. Twelve years of high school? And then did you go straight into farming?
A. Yes.
Q. Okay. How did you get involved in farming?
A. Father was a farmer.

5

Q. Your father was a farmer?
A. Yeah. We farmed together for a short time and then separated a little later.
Q. Okay. And you've been farming ever since?
A. Absolutely.
Q. Okay. Did you always own your own farm or lease a farm that was your own or did you work on someone else's?
A. Most of it was lease land to start with.
Q. Okay.
A. And then later, '72, we did buy acreage in 1972.
Q. But was it always your own operation that you managed?
A. Yes.
Q. Okay. And in 1994 about how many acres did you farm in total?
A. Well, entirety or -- it's been condensed somewhat, but somewhere around 700 in total.
Q. And that's your total farming operation?
A. Yes. For myself, yes.
Q. Okay. And since then you farm less?
A. Well, no, we actually do farm more, but some of these leases here weren't --
Q. Some are no longer in the complaint? Is that what you mean?
A. Yes. So it's hard to know the acreage there.

6

Q. Right. I understand that. I meant in total. What kinds of crops did you farm in 1994?
A. '94? We lost the sugar beets. And in '94 there was a lot of mint and corn. Corn for silage, corn for grain. And we had a small acreage of grapes near our home.
Q. Okay. And on the allotments that are left here, most of that was grain corn; is that correct?
A. Yes, it was.
Q. Was any of that mint?
A. The mint was on the excluded acres.
Q. So in this case now we're dealing only with grain corn?
A. Yes. And silage.
Q. Oh, we do have silage corn?
A. Yeah. There's one piece of silage.
Q. What allotment was that?
A. Gosh.
MR. CARROLL: 794.
THE WITNESS: 794 is my homeplace. Yeah. That's the homeplace where we live.
Q. (By Mr. Edmunds) Okay. So that was the only silage corn?
A. Yeah.
Q. What is silage corn? What is the difference -- strike that. What is the difference between silage and grain

7

corn? Can you explain that a little bit?
A. Grain corn is used pretty much -- the ears are harvested for cattle purposes, feed purposes. Silage, the whole fodder is chopped totally, the ears, the stock and all, and goes commonly into a pit and packed down for dairy purposes, dairy feed. And we're very heavy in the dairy area here in the Yakima Valley.
Q. So both types of corn are ultimately used for feed?
A. Yes, uh-huh.
Q. Okay. And you said you've lived your entire life in Yakima. All of your farming operation has been in Yakima?
A. 25 miles down the road in Granger.
Q. Granger?
A. Yes.
Q. Is all that land within the Wapato Irrigation Project?
A. All the land is within Wapato Irrigation Project, yes.
Q. Okay. So all the land you've ever farmed is within this irrigation project?
A. Yes.
Q. Okay. You're married, sir?
A. Yes.
Q. And your wife is a plaintiff in this case?

8

A. Yes.
Q. And what is your wife's name?
A. Reinie, R-e-i-n-i-e. She's a housewife and a tax accountant.
Q. Does she work on the farm?
A. She's got a little office there, and she's got about 300 tax accounts.
Q. I mean, does she farm?
A. She used to work with us on the farm, help irrigate and such. We've been a team for many years.
Q. Okay. I understand. In 1994 she would be a person who was working on the farm?
A. Oh, absolutely.
Q. And would be familiar with the irrigation --
A. Absolutely.
Q. -- and the growth of the crops?
A. She was a part of it. We used to irrigate together.
Q. Okay. And so she was pretty much involved in the same aspects of the farming operation that you were. Is that fair to say?
A. Yes. And she pretty much -- she writes all the checks for the farm pretty much through her accounting business. And so --
Q. So she manages the accounts?

9

A. She pretty much manages the accounts.
Q. And you have two sons?
A. Three sons.
Q. Three sons.
A. Yes.
Q. Okay. And their names are --
A. Scott is our oldest. He's 42. He's security at Hanford. Craig is my middle boy you'll meet later. He farms with me on the farm. We farm separately, but together. He has his acres. I have ours. But we farm together totally.
Q. Okay.
A. And our youngest son, Kirk -- I believe you'll meet him as well -- he is a John Deere tractor equipment salesman in the Town of Sunnyside.
Q. Okay. But he also farmed in 1994?
A. At the time he did farm, yes. He was young beginning in farming.
Q. And would the same thing that you just said about your son Craig be true about your son Kirk, he worked with you in the farming operation?
A. We all did. It was a team effort, yes.
Q. Okay. I have some more questions about that. It was a team effort. You all had your own tracts of land that you either owned or leased, each person did; is that correct?
A. Yes.

10

Q. So Craig had some, Kirk had some, and you had some?
A. Yes.
Q. But did you have any sort of business organization? Would you call it a partnership, a corporation, something like that?
A. It was not a legal partnership, sir. It was more or less just a family partnership.
Q. Just kind of an arrangement in the family?
A. Yes. Dad had the equipment. We shared the work load. And they got their balances in the end at harvest and we got ours. It worked out very well.
Q. So you would take the profits from the allotments that were assigned, the parcels that were assigned to each person --
A. Yes, mm-hm.
Q. -- but you could be working on, for example, one of your son's, Kirk's, parcels at any given time?
A. Until the work was done. It didn't matter where. Just wherever the need was we joined forces and --
Q. So the parcels were mainly a system of accounting --
A. Yes.
Q. -- in how you would split the profits?
A. Well, the profits was -- if it was their

11

allotments, it was the profits of those allotments for their behalf.
Q. Okay.
A. Yeah.
Q. Thanks.
A. Some of Kirk's has been withdrawn. He was beginning in farming, at the early stage. And we was trying to get him in as farming. But this here drastically affected his life and his young marriage life. I mean, they were just freshly married and it was a beginning that lasted only about a year and a half. So --
Q. This was in 1994?
A. Yes.
Q. Did you have any employees on these farms? Besides working with your sons, did you hire anybody else?
A. Just limited individuals to help with the irrigation. The boys and I did all the tractor work at that time. And irrigation was something that needed 24/7. And we had many fellows in the Granger area willing to help us.
Q. Okay. When you say work with the irrigation, you mean what exactly?
A. Changing waters, distributing waters, rotating waters.
Q. Okay.
A. Our land is all real irrigated, ditch, furrow

12




33

very nil. Up the road three miles they had ample water, three to four miles up the lateral in this one situation.

We called Mr. Oberly and he agreed to come to this specific spot because we have no water. He said, "Meet me. I will provide you a tort claim." And that's our means of settlement for damages done.

Q. Okay. But this statement that you received no water, that means from the WIP, from the irrigation project? You received no water whatsoever from the irrigation project during that time?

A. At that date there was no water in the canal and subsequent days before and after. We were very frustrated as to what to do because we seen our crop wilting away. And --

Q. Let me refer you to another exhibit then, and I'll mark this as Exhibit 2.

A. And as I said again, as we would continue up that same lateral three to four miles, nice green, lush fields. But yet, the appropriation of water was not delivered to the end of the lateral as we thought we was entitled to.

(Exhibit No. 2 marked for identification.)

Q. (By Mr. Edmunds) Mr. Oswalt, you can if you want, but I'm not sure you need to read the entire thing. But if you'd take a look at this and see if you're familiar with it,



I'd appreciate that.

A. Yes.

Q. Okay. And this is the Notice of Appeal that you filed to the agency, the Department of the Interior, in the administrative proceedings in this case; is that correct?

A. Yes.

Q. Okay. Could you please turn for me to Page 6. And do you see about halfway down the page in bold there's a sentence that's in bold and is underlined?

A. Yes.

Q. And it says, "The appellants did not receive any irrigation water during the time period of June 10 through July 25, 1994. None. Zero. No water."

Is that what it says?

A. Yes, it does say that.

Q. And is that a correct statement?

A. Very much so. I mean, any water that was was provided by the pumping systems that we helped set up and create. The water that was coming out of the system in a natural flow was nil, nothing, at that latter end of --

Q. Okay. So it's your testimony that you received no water from the Wapato Irrigation Project?

A. In this specific area that Mr. Oberly met us, right.

Q. Well, this document, does it not, refers to all of



the allotments at issue in this case?

A. To say anything different to that is very little or nil. I mean, it was nil, nothing.

Q. Okay. And that is all, I believe, nine or ten allotments that are at issue in this case?

A. We are on the end of four different allotments.

Q. At no time during June 10 through June 25, 1994, to be clear on the record, at no time did you receive more than nil water?

A. Very little, if any, would be my statement.

Q. Okay.

A. Certainly nothing to make a crop because it was just withering away, burning up.

Q. So you didn't attempt to measure the amount of the water at all, did you?

A. They have no means of measurement on the Wapato Irrigation Project.

Q. Did you try to measure the amount of water that was coming into your farms?

A. Sir, there was empty canals. There was no means of measuring because it was nil.

Q. All right. Let me ask you -- you referred to things that you did to try to get water.

A. Yes.

Q. Can you describe those a little bit? And I



assume -- let me start out by saying these were things that you did independently of the project; is that correct?

A. We went to the project. We talked to them. And at the time Mr. Harry Cartmell was placed as overseeing for the project amongst the water masters.

We met with Mr. Cartmell upon many occasions, asked if there was any pumping available on their part. He says, "No, not at present. We have one." That one was brought to the farm and set up on one location. We asked if there was a possibility of getting others. He checked the Portland source and others. No, there's not.

My son and I went to a dealer east of town. The Caterpillar dealer had several pumps up there at that time for rent, big pumps. We went back to Mr. Cartmell. "Harry, what about these pumps? They are available." He says, "I'll put in a recommendation or a requisition to see if we can cover it."

Three weeks later he says, "Dean, we're open. How about getting one of those pumps?" It helped, but we were approaching the first of July at this time.

Q. Okay. So this is around the first of July?

A. Somewhere in there, that first big pump.

Q. And Mr. Cartmell puts in the first pump?

A. We helped him set it up, sir, all the way. And then there was other pumps. We borrowed from neighbors.