IN THE UNITED STATES COURT OF FEDERAL CLAIMS

A. DEAN OSWALT and REINIE OSWALT, husband and wife; CRAIG OSWALT and MICHELLE OSWALT, husband and wife; and KIRK OSWALT and STACIE OSWALT, husband and wife,

Plaintiffs,

vs.

UNITED STATES OF AMERICA,

Defendant.

NO. 97-733 C

ORIGINAL

DEPOSITION OF A. DEAN OSWALT

Taken at the instance of the Defendant

April 24, 2007

10 o'clock a.m.

402 East Yakima

Yakima, Washington

BRIDGES & ASSOCIATES
Certified Shorthand Reporters
P. O. Box 5999
Kennewick, Washington 99336
(509) 735-2400 - (800) 358-2345

very nil. Up the road three miles they had ample water, three to four miles up the lateral in this one situation.

We called Mr. Oberly and he agreed to come to this specific spot because we have no water. He said, "Meet me. I will provide you a tort claim." And that's our means of settlement for damages done.

Q. Okay. But this statement that you received no water, that means from the WIP, from the irrigation project? You received no water whatsoever from the irrigation project during that time?

A. At that date there was no water in the canal and subsequent days before and after. We were very frustrated as to what to do because we seen our crop wilting away. And --

Q. Let me refer you to another exhibit then, and I'll mark this as Exhibit 2.

A. And as I said again, as we would continue up that same lateral three to four miles, nice green, lush fields. But yet, the appropriation of water was not delivered to the end of the lateral as we thought we was entitled to.

(Exhibit No. 2 marked for identification.)

Q. (By Mr. Edmunds) Mr. Oswalt, you can if you want, but I'm not sure you need to read the entire thing. But if you'd take a look at this and see if you're familiar with it,

I'd appreciate that.

A. Yes.

Q. Okay. And this is the Notice of Appeal that you filed to the agency, the Department of the Interior, in the administrative proceedings in this case; is that correct?

A. Yes.

Q. Okay. Could you please turn for me to Page 6. And do you see about halfway down the page in bold there's a sentence that's in bold and is underlined?

A. Yes.

Q. And it says, "The appellants did not receive any irrigation water during the time period of June 10 through July 25, 1994. None. Zero. No water."

Is that what it says?

A. Yes, it does say that.

Q. And is that a correct statement?

A. Very much so. I mean, any water that was was provided by the pumping systems that we helped set up and create. The water that was coming out of the system in a natural flow was nil, nothing, at that latter end of --

Q. Okay. So it's your testimony that you received no water from the Wapato Irrigation Project?

A. In this specific area that Mr. Oberly met us, right.

Q. Well, this document, does it not, refers to all of

the allotments at issue in this case?

A. To say anything different to that is very little or nil. I mean, it was nil, nothing.

Q. Okay. And that is all, I believe, nine or ten allotments that are at issue in this case?

A. We are on the end of four different allotments.

Q. At no time during June 10 through June 25, 1994, to be clear on the record, at no time did you receive more than nil water?

A. Very little, if any, would be my statement.

Q. Okay.

A. Certainly nothing to make a crop because it was just withering away, burning up.

Q. So you didn't attempt to measure the amount of the water at all, did you?

A. They have no means of measurement on the Wapato Irrigation Project.

Q. Did you try to measure the amount of water that was coming into your farms?

A. Sir, there was empty canals. There was no means of measuring because it was nil.

Q. All right. Let me ask you -- you referred to things that you did to try to get water.

A. Yes.

Q. Can you describe those a little bit? And I

assume -- let me start out by saying these were things that you did independently of the project; is that correct?

A. We went to the project. We talked to them. And at the time Mr. Harry Cartmell was placed as overseeing for the project amongst the water masters.

We met with Mr. Cartmell upon many occasions, asked if there was any pumping available on their part. He says, "No, not at present. We have one." That one was brought to the farm and set up on one location. We asked if there was a possibility of getting others. He checked the Portland source and others. No, there's not.

My son and I went to a dealer east of town. The Caterpillar dealer had several pumps up there at that time for rent, big pumps. We went back to Mr. Cartmell. "Harry, what about these pumps? They are available." He says, "I'll put in a recommendation or a requisition to see if we can cover it."

Three weeks later he says, "Dean, we're open. How about getting one of those pumps?" It helped, but we were approaching the first of July at this time.

Q. Okay. So this is around the first of July?

A. Somewhere in there, that first big pump.

Q. And Mr. Cartmell puts in the first pump?

A. We helped him set it up, sir, all the way. And then there was other pumps. We borrowed from neighbors.

Three other pumps we borrowed from neighbors trying to get something to make a crop out of it because it was just deteriorating as we talked.

Q. Where were you pumping the water from?

A. Laterals, drains. There's a big drain that goes through the area in which we talk on this one area. Out of ponds. We pumped a pond dry. And still very little. I mean, it was just not adequate.

Q. Okay. So this water was still coming from the Wapato Irrigation Project?

A. Very little, sir, from the gravity flow system, their system. The water was mainly by pump.

Q. But the water that you pumped, it still came from water that was ultimately diverted from the Yakima River?

A. The big Marion Drain is not from the Yakima River. It's the drainage off the project from the grounds west. And it's a big drain that runs through our deeded property, and it was the mainstay for pumping. We had four pumps set up at one time trying to save the crop.

Q. Okay. But it was drainage water that was ultimately diverted from the Wapato Irrigation Project system?

A. Sir, it was drain water off the tailings of all the fields above. I don't think it was diverted for any reason into that drain other than it's drain water off

Q. When you're talking about the minimum water that you did receive, that's from the four pumps that we talked about that were done in conjunction with Mr. Cartwell (sic)?

A. He provided us two pumps, sir. The rest of them was attained from neighbors, our own dairies. We got pumps from dairies, out of their lagoons. Any means of water. We was borrowing, begging, renting, whatever, trying to sustain to make the crops.

Q. Did the Department of Interior provide you assistance in receiving any of that water?

A. Department of Interior? Very little come of the natural flow system.

Q. With the neighbors, the dairies that you're talking about, was Mr. Cartwell (sic) involved in helping you establish that?

A. No. He was involved only with the pumps from the Caterpillar dealer east of us. And they had one pump on hand, I believe, of their own that was put on another strategic spot pumping out of a drain. A small, very small pump.

Q. Okay. Now, you submitted your initial claim to the agency -- I believe it was in 1994 you submitted documentation. Do you recall that documentation? Do you recall your submission to the agency?

A. To the agency or Mr. Oberly?