# In the United States Court of Federal Claims

**No. 97-733C**

**(Filed December 17, 2008)**

```
* * * * * * * * * * * * * * * * * * * * * *
                                    *
A. DEAN OSWALT and REINIE           *
OSWALT, husband and wife, et al.,   *
                                    *  Summary Judgment, Irrigation
            Plaintiffs,             *  Rights, Condition Precedent,
                                    *  Breach of Contract, Expectation
      v.                            *  Damages, Causation Standard
                                    *
THE UNITED STATES,                  *
                                    *
            Defendant.              *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
```

     *John Jay Carroll*, Yakima, Washington, attorney of record for Plaintiffs.

     *Roger Allen Hipp*, Department of Justice, Washington, D.C., with whom was *Assistant Attorney General Gregory G. Katsas*, for Defendant. *Jeanne E. Davidson*, Director, and *Kirk T. Manhardt*, Assistant Director.

## OPINION & ORDER

     *Futey,* **Judge**.

     This breach of contract case is before the Court on the parties' cross-motions for summary judgment. Plaintiffs A. Dean and Reinie Oswalt, Craig and Michelle Oswalt, and Kirk and Stacie Oswalt (collectively, "plaintiffs"), allege in their Renewed Motion For Summary Judgment[1] that plaintiffs had contracted

---

[1] Plaintiffs' motion is actually for partial summary judgment, as plaintiffs seek solely a determination on liability. Pls.' Mot. for Summ. J. & Mem. in Support Thereof at 2-3.

with defendant for the provision of irrigation water to seven allotments of land leased by plaintiffs from the government.  Plaintiffs further allege that defendant breached those contracts by failing to provide irrigation water to plaintiffs from June 10, 1994 through July 25, 1994.   Finally, plaintiffs allege that as a result of defendant's breach, plaintiffs suffered a substantial crop loss.

Defendant, on the other hand, asserts in its Motion For Summary Judgment that plaintiffs failed to make timely payment of operation and maintenance assessments for four of the land allotments at issue, thereby relieving defendant of its obligation to provide irrigation water to those allotments.  With regard to the allotments for which plaintiffs did pay the operation and maintenance assessments, defendant contends that plaintiffs cannot establish the amount of damages caused by the alleged breach with reasonable certainty.

Currently before the Court are plaintiffs' Renewed Motion For Summary Judgment And Memorandum In Support Thereof, Defendant's Response To Plaintiffs' Motion For Summary Judgment, and Plaintiffs' Reply Memorandum, as well as Defendant's Motion For Summary Judgment, Defendant's Proposed Findings Of Uncontroverted Fact, plaintiffs' Memorandum In Opposition To Defendant's Motion For Summary Judgment, Plaintiffs' Response To Defendant's Proposed Findings Of Uncontroverted Fact, and Defendant's Reply In Support Of Its Motion For Summary Judgment.

1.   Background

Plaintiffs farm lands located within Wapato Irrigation Project ("WIP"). WIP is located in the Yakima Indian Reservation   ("Reservation"), and is administered by the Bureau of Indian Affairs ("BIA") on behalf of the Secretary of the Department of the Interior.[2]   The Reservation, created by treaty on June 9, 1985, is located in Yakima County, in the State of Washington.

In 1887, Congress passed the General Allotment Act ("GAA"), which directed the Secretary to allot lands within the Reservation to individual Indians. 49 Cong. Ch. 119, 24 Stat. 388-390 (1887).  The GAA authorized the Secretary to hold the allotted land in trust for a period of twenty-five years.  *Id*.  Additionally, the GAA authorized the Secretary to promulgate rules and regulations in order "to secure a just and equal distribution" of irrigation water to the extent the water was necessary to render the land "available for agricultural purposes."  *Id*.

---

[2]  WIP is one of numerous irrigation districts located within the Yakima Reclamation Project.

The Reclamation Act of 1902 ("RA") permitted the Secretary to construct irrigation projects to provide water for agricultural purposes.  43 U.S.C. § 317 (*repealed*).  WIP was created pursuant to the RA.  In 1904, Congress enacted legislation that directed the Secretary "to sell or dispose of unallotted lands embraced in the Yakima Indian Reservation."  Pub. L. No. 58-3, 33 Stat. 595 (1904).  This legislation required the Secretary to apply the proceeds of the sale of unallotted land to, among other things, "the construction, completion, and maintenance of irrigation ditches."  *Id*.  This legislation further permitted the Secretary "to require . . . annual proportionate payments to be made as may be just and equitable for the maintenance of [irrigation] systems."  *Id*.

In 1916, Congress enacted legislation permitting the Secretary to fix operation and maintenance ("O&M") charges, as well as implement rules and regulations concerning the distribution of water.  Pub. L. 64-80, 39 Stat. 123 (1916).  Under the regulatory scheme promulgated by the Secretary, defendant, acting through BIA, sets rates paid for water, assesses and collects fees for maintenance, and delivers irrigation water to the boundary of individual farm units.  25 C.F.R. § 171 (1994).  BIA also operates, controls, and manages the diversion and distribution facilities that serve the lands within WIP.  Once water is diverted into the Yakima Indian Reservation at WIP diversion points, WIP allocates this water among landowners or users through a system of irrigation canals.

There are two categories of land serviced by irrigation water – fee lands and trust lands.  Fee lands are lands conveyed by the Department of the Interior to private individuals.  Trust lands are held by the Secretary in trust for the Yakima Nation, and they are leased by Indians.  The right to obtain irrigation water for fee lands is governed by a document entitled "Application for Water Right," whereas the right to obtain irrigation water for trust lands is governed by the Lease Agreements.  Plaintiffs have an interest in five allotments of fee lands and seventeen allotments of trust lands; claims concerning seven of the trust land allotments are presently at issue.

The parties' dispute concerns a number of events that occurred in 1994.  First, plaintiffs failed to fully pay their O&M assessments for all of their allotments prior to the 1994 irrigation season.  The record provides that plaintiffs made partial payments on April 29, 1994, and June 23, 1994.  Second, the Reservation experienced one of the worst droughts on record, resulting in drastic reduction in the amount of water available for irrigation.  In fact, on May 18,

1994, the United States Bureau of Reclamation ("BOR") notified all Yakima district managers, including the manager of WIP, that each district would receive only thirty-five percent of the proratable storage water to which it was entitled for the 1994 season.  On June 8, 1994, BOR notified district managers that water supply conditions deteriorated, and consequently, only thirty-four percent of the proratable water entitlements would be available to each district.  In order to cope with the drought conditions, WIP adopted a diversion plan, as well as a water distribution plan, for the 1994 season.  The purpose of the water distribution plan was to "ensure an equitable distribution of the available water to each major lateral and subdivision of the project."

Plaintiffs admit they received their proportionate share of water until June 9, 1994.  According to plaintiffs, from June 10, 1994, until July 24, 1994, there was insufficient water in the canals servicing the land they farmed to permit irrigation.  Plaintiffs maintain that other farmers, whose lands are located further up the canal, received sufficient irrigation water.  Plaintiffs contend that in June 1994 they met with A.C. Oberly, WIP's Administrator, and complained that the lands they farmed were not receiving adequate irrigation water for their crops.  In addition, plaintiffs posit that at this meeting they "agreed to sign a promissory note for the balance of the money due on the [O&M] assessments for the 1994 season," and that "Mr. Oberly agreed to draw up the note for signature by the plaintiffs."

Plaintiffs filed their Amended Complaint on April 21, 1998, asserting that defendant breached its contractual obligations by failing to provide them with their proportionate share of irrigation water for land allotments plaintiffs owned or leased.   According to plaintiffs, these breaches resulted in the loss of production in the commercial crops grown on the land they farmed.  Defendant filed a Motion To Dismiss, Or In The Alternative, For Summary Judgment, on September 10, 1998, asserting: (1) the Court lacked jurisdiction to adjudicate plaintiffs' claims because plaintiffs lacked privity of contract with the government; and (2) if jurisdiction was proper, plaintiffs failed to exhaust their administrative remedies before filing suit in this Court.

On October 17, 2000, this Court issued a decision partially granting defendant's motion to dismiss.  Specifically, the Court found that it lacked jurisdiction to adjudicate plaintiffs' breach of contract claims for allotments where plaintiffs were not in privity of contract with defendant.  Plaintiffs originally asserted claims concerning five fee lands and seventeen trust lands.  The Court found that plaintiffs were not in privity of contract with defendant for four of the

fee lands and ten of the trust lands; those claims were consequently dismissed.
Nonetheless, the Court found that plaintiffs were in privity of contract with
defendant for eight allotments, including lot 794 of the fee lands, which plaintiffs
own, and seven trust lands plaintiffs leased directly from defendant: lots 361, 363,
T-1011, 1988, 2303 and T-2303, 3704 and 3705, and 3694.[3]  The Court, however,
went on to find that 25 C.F.R. § 171.22 required that plaintiffs exhaust their
administrative remedies before the Court could consider the merits of the
surviving claims, and therefore stayed the case.

The Federal Circuit affirmed the dismissal, but on other grounds:
plaintiffs' claims should have been dismissed on their merits, rather than for lack
of jurisdiction.  Further proceedings remained stayed in this Court, however, and
plaintiffs brought their surviving claims before the WIP Administrator.   On
November 16, 2004, the WIP Administrator denied plaintiffs' claims; the decision
was subsequently affirmed by the Northwest Regional Director.   Having
exhausted their administrative remedies, plaintiffs now renew their breach of
contract claims for the seven trust lands that survived defendant's earlier motion
to dismiss.[4]

2.  Discussion

Summary judgment is appropriate when there are no genuine issues of
material fact and the moving party is entitled to judgment as a matter of law.
RCFC 56(c); ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 247 (1986); ***Jay v.
Sec'y of Dep't of Health & Human Servs.***, 998 F.2d 979, 982 (Fed. Cir. 1993).
A fact is material if it might significantly affect the outcome of the suit under the
governing law.   ***Anderson***, 477 U.S. at 248.   The party moving for summary
judgment bears the initial burden of demonstrating the absence of any genuine
issues of material fact.   ***Celotex Corp. v. Catrett***, 477 U.S. 317, 325 (1986).  If the
moving party demonstrates an absence of a genuine issue of material fact, the
burden then shifts to the non-moving party to show that a genuine issue exists.
***Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.***, 833 F.2d 1560, 1562-63
(Fed. Cir. 1987).   Alternatively, if the moving party can show that there is an
absence of evidence to support the non-moving party's case, then the burden

---

[3] There are seven leases addressed here, but some of these leases include more
than one allotment.  This is why there are nine lot numbers listed even though the
court refers to these lands as "seven trust lands."

[4] Plaintiffs' claim for lot 794 of the fee lands also survived the motion to dismiss;
however, plaintiffs failed to pursue that claim before the BIA, and therefore may
not pursue it here.  Pls.' Response to Def.'s Proposed Findings of Uncontroverted
Fact at 3-4, ¶ 7.

shifts to the non-moving party to proffer such evidence. *Celotex*, 477 U.S. at 325. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, to whom the benefits of all favorable inferences and presumptions run. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir. 1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed. Cir. 1984).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of each party's motion. *Prineville Sawmill Co., Inc. v. United States*, 859 F.2d 905, 911 (Fed. Cir. 1988)(citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States*, 33 Fed. Cl. 514, 518 (1995). Therefore, it does not follow that if one motion is rejected, the other is necessarily supported. *Id*. Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id*. (citing *Corman v. United States*, 26 Cl. Ct. 1011, 1014 (1992)).

A. *Jurisdiction*

The jurisdiction of the United States Court of Federal Claims is set forth in the Tucker Act. 28 U.S.C. § 1491 (2008). Under the Tucker Act, the court "shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id*. § 1491(a)(1). The Tucker Act is jurisdictional only, and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976); *Tippett v. United States*, 185 F.3d 1250, 1254 (Fed. Cir. 1999). Rather, the Tucker Act "merely confers jurisdiction upon [this court] whenever the substantive right exists." *Testan*, 424 U.S. at 398 (internal citation omitted).

B. *Breach of Contract*

Both parties contend that the other breached its contractual obligations and that each party is, individually, entitled to summary judgment in its favor. Plaintiffs assert that defendant had a contractual obligation to deliver an equitable share of irrigation water to each of plaintiffs' land allotments, and that defendant

breached that obligation when it failed to provide irrigation water for a period of forty-four days in 1994.  Defendant argues, however, that it had no obligation to deliver irrigation water to plaintiffs.  Specifically, defendant asserts that plaintiffs failed to make timely payment of O&M assessments for those allotments, which is a condition precedent to the delivery of irrigation water.

Plaintiffs are parties to express contracts with the United States granting them irrigation rights for the seven trust lands plaintiffs lease directly from the government.  *Oswalt v. United States*, No. 01-5037, 2002 U.S. App. LEXIS 14313, at *7-8 (Fed. Cir. July 12, 2002).  Defendant has an obligation to deliver an equitable share of the irrigation water available to plaintiffs' allotments. Regulations promulgated by the Secretary of the Interior pursuant to 25 U.S.C. § 381, provide that the Officer-in-Charge of the irrigation project is responsible for insuring the "equitable use of the water supply" within the irrigation district.  25 C.F.R. § 171.1(c) (1994).    Nonetheless, timely payment of – or arrangements to pay – the O&M assessments is a precondition to the delivery of irrigation water. The regulations provide that "[w]ater will not be delivered to Indian trust or restricted land that are under lease . . . *until the lessee has paid the annual assessed operation and maintenance charges*."    25 C.F.R. § 171.17(b) (1994)(emphasis added).    Thus, unless plaintiffs can establish that timely payments were made for each allotment, they "cannot establish the obligation by the government to deliver water, or consequently, a breach of that obligation." *See Oswalt*, 2002 U.S. App. LEXIS 14313, at *10 (finding no obligation of government to deliver irrigation water where plaintiffs had not paid O&M assessments in a timely manner).

1.   Did plaintiffs pay the O&M assessments in a timely manner?

Plaintiffs did not pay O&M assessments for each of the seven allotments presently at issue in 1994.  The facts reveal that plaintiffs made timely payments for three of the allotments: 361, 363, and 3694.  *See* Def.'s Proposed Findings of Uncontroverted Fact; Def.'s Mot. for Summ. J. at 4.  Defendant therefore had an obligation to deliver an equitable amount of irrigation water to those three allotments.  Plaintiffs did not, however, make timely payments for the remaining four land allotments.  Plaintiffs paid the O&M assessment for allotment 1988 on June 23, 1994, but it did not make any payments in 1994 for allotments T-1011,

2303 and T-2303, or 3704 and 3705.[5]  Pls.' Response to Def.'s Proposed Findings of Uncontroverted Fact at 3, ¶¶ 5-6.

Plaintiffs assert that defendant was obligated to deliver irrigation water to the four allotments, notwithstanding plaintiffs' failure to pay the O&M assessments, because plaintiffs made "satisfactory arrangements" for their payment.  Pls.' Cross-Mot. for Summ. J. & Mem. in Support Thereof & in Opp'n to Def.'s Mot. at 9.  Plaintiffs allege that Dean Oswalt signed a promissory note in 1994 for the remaining O&M assessments.  Pls.' Proposed Findings of Uncontroverted Fact at 4, ¶ 7.  Defendant, however, disputes that a promissory note was signed at all; moreover, defendant asserts that even if a promissory note were signed, it would not satisfy plaintiffs' obligation to pay O&M assessments.

O&M assessments must generally be paid prior to delivery of irrigation water to lands on Indian Reservations.  *See* 25 C.F.R. § 171.17.  Under 25 C.F.R. § 171.17(b), "[w]ater will not be delivered to Indian trust or restricted land[s] that are *under lease* . . . until the lessee *has paid* the annual assessed operation and maintenance charges."  (emphasis added).  The preceding subsections of the same regulatory provision, however, allow for Indian *owners* of trust or restricted lands to make arrangements to pay assessments if they are financially unable to do so when payment is due, or for farmers of *non-Indian lands* to execute deferred payment contracts.  *See* 25 C.F.R. § 171.17(a)(1)-(2).  Because plaintiffs lease the lands at issue, defendant contends that only actual payment of the O&M assessments would satisfy plaintiffs' obligation.

"In construing a statue or regulation, we commence by inspecting its language to ascertain its plain meaning."  ***Diefenderfer v. Merit Sys. Prot. Bd.***, 194 F.3d 1275, 1278 (Fed. Cir. 1999).  "If the terms of the statute or regulation are unambiguous, no further inquiry is usually required."  ***Id***.  "When we find the terms of a statute unambiguous, judicial inquiry should be complete except in rare and exceptional circumstances."  ***Freytag v. Commissioner***, 501 U.S. 868, 873 (1991)(internal citation omitted).  Here, the language of the regulation is unambiguous.  The subsections of the regulation individually address trust lands "farmed by the Indian owner;" "[n]on-Indian lands;" Indian trust land "under lease approved by the Secretary of the Interior;" and "Indian trust land under a lease that has been negotiated by an Indian owner."  *See* 25 C.F.R. §§ 171.17(a)(1)-(2), (b), and (c).  The allotments at issue are Indian trust lands leased

---

[5] Allotment 2303 and T-2303 is not specifically addressed in the record, but no evidence has been presented to show that the O&M assessment for this allotment was paid in 1994.

by plaintiffs with the approval of the Secretary of the Interior. Therefore, 25 C.F.R. § 171.17(b) applies. Because § 171.17(b), on its face, requires actual payment, a promissory note to pay the O&M assessments at a later date would not satisfy plaintiffs' obligation to pay.[6] Defendant therefore had an obligation to deliver irrigation water to allotment 1988 beginning on June 23, 1994, the date on which plaintiffs paid the O&M assessment for that lot; however, defendant had no obligation to deliver water to allotments T-1011, 2303 and T-2303, and 3704 and 3705, because plaintiffs did not pay the O&M assessments for those lots in 1994.

> 2. Did defendant deliver plaintiffs' proportionate share of irrigation water?

Plaintiffs allege that defendant failed to deliver a proportionate share of irrigation water to plaintiffs' four eligible land allotments between June 10, 1994, and July 25, 1994. Pls.' Renewed Mot. for Summ. J. & Mem. in Support Thereof at 2. Defendant had an obligation to provide a proportionate share of irrigation water to three of those allotments for the entire 1994 irrigation season, and to allotment 1988 beginning on June 23, 1994. During that time period, plaintiffs claim they received "little or no irrigation water from WIP," while other farmers were receiving sufficient water. *Id.*; Pls.' Proposed Findings of Uncontroverted Facts at 10, ¶ 18.

Defendant counters plaintiffs' allegation, instead contending that plaintiffs received an equitable distribution of the available water. Def.'s Response to Pls.' Mot. for Summ. J. at 2. The evidence cited by defendant, however, runs contrary to its own assertion. There was water available in the Reservation at the time in

---

[6] The Court notes further that even if a promissory note would satisfy plaintiffs' obligation, plaintiffs have failed to prove the existence of such a note. Plaintiffs assert that "Dean Oswalt made arrangements with BIA personnel to pay the remainder of the balance," and that "[a] promissory note was signed." Pls.' Proposed Finding of Uncontroverted Facts at 4, ¶ 7. Additionally, Craig Oswalt stated in his affidavit that "Mr. Oberly agreed to make arrangements to put the balance on a promissory note. . . . When we were contacted, my father came down and signed the note." Craig Oswalt Aff. ¶ 4 (12/18/98). Nonetheless, no promissory note has been produced, nor has Dean Oswalt stated on the record that he signed a promissory note in 1994. Moreover, plaintiff stated at oral argument on November 30, 1999, that the arrangement with Mr. Oberley was an oral one. Tr. 57: 6-8. Defendant, on the other hand, has provided the declarations of Marie Howerton, Administrative Officer of the WIP; Benjamin Domondon, Accountant for the WIP; and Acey Oberly, Jr., Project Administrator for the WIP; all of whom state that no promissory note was executed during the 1994 irrigation season.

question, just in reduced quantities; thirty-four percent of the proratable entitlement was available until July 8, 1994, at which point thirty-nine percent of the proratable entitlement was available. Oberly Aff. ¶ 3. Harry Cartmell, who assisted the Irrigation Systems Manager in supervising water distribution in the WIP during 1994, stated in his declaration that "the drought made it *impossible* to deliver sufficient water" to certain areas on the Reservation, including those where plaintiffs' allotments were located. Cartmell Decl. ¶ 5 (emphasis added). Notwithstanding the reduced quantities of water due to the drought, plaintiffs were entitled to their proportionate share of the water that was available. Defendant admits that plaintiffs did not receive irrigation water during the applicable period in 1994. *See Id.* Therefore, defendant breached its lease agreements with plaintiffs for allotments 361, 363, 1988, and 3694.

C. *Damages*

Defendant claims that even if it breached its contractual obligation to distribute water to plaintiffs' allotments in 1994, plaintiffs' damages are not reasonably certain and defendant is therefore entitled to summary judgment in its favor. Conversely, plaintiffs argue that, at the very least, genuine issues of fact exist as to damages. Moreover, plaintiffs contend there is nothing speculative about the damages sought because plaintiffs' damage computation is based on plaintiffs' familiarity with "average yields" on their land, actual yields in 1994, and the prices received in 1994.

In breach of contract cases, successful plaintiffs are generally awarded expectation damages, which are "damages that will place the injured party in as good a position as he or she would have been in had the breaching party fully performed." *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1021 (Fed. Cir. 1996)(internal citations omitted). Expectation damages are recoverable where: (1) "damages were reasonably foreseeable by the breaching party at the time of contracting;" (2) damages were caused by the breach; and (3) "the damages are shown with reasonable certainty." *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005)(citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)); *see also Bluebonnet Savings Bank, FSB v. United States*, 67 Fed. Cl. 231, 235 (2005). These factors, when applied in concert, ensure that a damages award may not be based on mere speculation. *See Bluebonnet*, 67 Fed. Cl. at 235.

When awarding expectation damages, the initial inquiry is whether it was foreseeable at the time of contracting that a breach of contract could cause the

type of loss alleged by the non-breaching party.   In order to establish foreseeability, the non-breaching party must demonstrate either that "the loss was natural and inevitable upon the breach so that the defaulting party may be presumed from all the circumstances to have foreseen it," or that the breaching party was aware of special circumstances precipitating the loss.  **Chain Belt Co. v. United States**, 127 Ct. Cl. 38, 58 (1954).  Here, the contract between plaintiffs and defendant was for the provision of irrigation water to agricultural lands used to grow commercial crops.  It is natural and inevitable that if water is not provided to crops, the plants will not be able to grow.  Therefore, the Court presumes that it was foreseeable to defendant at the time of contracting that its failure to provide irrigation water could result in loss of crops.  The Court must next consider whether the damages were in fact caused by defendant's breach, and whether the damages are reasonably certain.

The proper standard for evaluating causation in a breach of contract case is the "but for" standard.  *See* **Yankee Atomic Electric Co. v. United States**, 536 F.3d 1268, 1272 (Fed. Cir. 2008)(stating that the substantial factor test is not preferred).  Plaintiff therefore "bears the burden of propounding a realistic but-for scenario . . . ."  **Coast Fed. Bank, FSB v. United States**, 48 Fed. Cl. 402, 430 n.25 (2000); *see also* **S. Cal. Fed. Sav. & Loan Ass'n v. United States**, 57  Fed. Cl. 598, 633 (2003)(explaining that "establish[ing] a 'but-for' world . . . is ordinarily required to state a valid claim for expectancy damages.").   In other words, plaintiffs must demonstrate "what might have been . . . ."  **Glendale Fed. Bank, FSB v. United States**, 239 F.3d 1374, 1380 (Fed. Cir. 2001).  By comparing the "but for" world with what actually occurred, plaintiffs can show what loss was caused by the breach.  Moreover, once causation is established, "it is not essential that the amount [of damage] be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'"  **Bluebonnet Sav. Bank, FSB v. United States**, 266 F.3d 1348, 1355 (Fed. Cir. 2001)(citing **Elec. & Missile Facilities, Inc. v. United States**, 189 Ct. Cl. 237, 257 (1969)(internal citation omitted)); *see also* **Story Parchment Co. v. Patterson Parchment Paper Co.**, 282 U.S. 555, 562 (1931)("The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."); **Chain Belt Co.**, 127 Ct. Cl. at 59.  "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery."  **Locke v. United States**, 151 Ct. Cl. 262, 267 (1960).

Defendant asserts that plaintiffs have not established the extent to which a reduced quantity of water will affect crop yields, nor that defendant's failure to provide irrigation water in 1994 caused the diminution of plaintiffs' crop yields. On this basis, defendant further contends that plaintiffs cannot establish the amount of damages with reasonable certainty.   Nonetheless, defendant has not demonstrated an absence of evidence to support plaintiffs' claim for damages, and thus has not met its burden for summary judgment.

In order to establish causation, plaintiffs must demonstrate what would have been if plaintiffs' land allotments had received an equitable distribution of water in 1994.   Defendant acknowledges this in its reply brief, and asserts that plaintiffs must create a "but-for" world using average crop yields from the 1994 irrigation season: "the relevant benchmark is not the average yield from years with average rainfall, but rather the yield plaintiffs would have obtained during the drought if they had received irrigation water."   Def.'s Reply at 4.   Plaintiffs have submitted that their damages claims are based on verifiable information regarding crop yields and sale prices in 1994; moreover, information is available regarding average yields in 1994 for crops on land allotments that received an equitable share of irrigation water.   *See* Carroll Aff., Ex. C (7/9/99).   Therefore, a final determination concerning the diminution of plaintiffs' crop yields in 1994 caused by defendant's breach, as well as the resulting monetary injury to plaintiffs, requires a more detailed ventilation of the facts.   *See **Peterson Builders, Inc. v. United States***, 31 Fed. Cl. 654 (1994); ***S. La. Grain Servs., Inc. v. United States***, 1 Cl. Ct. 281, 290 (1982).   Accordingly, summary judgment as to plaintiffs' damages claim is not appropriate at this time.

3.   Conclusion

For the foregoing reasons, plaintiffs' Renewed Motion For Summary Judgment is ALLOWED as follows:

1)   Defendant is liable to plaintiffs for breach of contract from June 10, 1994, through July 25, 1994, as to land allotments 361, 363, and 3694.
2)   Defendant is liable to plaintiffs for breach of contract from June 23, 1994, through July 25, 1994, as to land allotment 1988.

Defendant's Motion For Summary Judgment is partially ALLOWED and partially DENIED as follows:

1) Defendant's request for summary judgment as to land allotments T-1011, 3704 and 3705, and 2303 and T-2303 is allowed.

2) Genuine issues of material fact exist concerning plaintiffs' damages claims; defendant's request for summary judgment with regard to damages is therefore denied.

The Clerk of the Court is hereby directed to enter judgment in accordance with this Opinion.  No Costs.

The parties shall file a joint status report with the Court regarding further proceedings to determine damages, including an evidentiary hearing or trial, by January 30, 2009.

**IT IS SO ORDERED.**

**s/Bohdan A. Futey**
**BOHDAN A. FUTEY**
**Judge**